UNITED STATES of America

v.

Robert B. SUTTON, Appellant.

UNITED STATES of America

v.

Mark A. SUCHER, Appellant.

Nos. 85–5277, 85–5600.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1986.

Decided Aug. 29, 1986.

Mitchell B. Lansden, appointed by this Court, for appellant in No. 85–5277.

W. Gary Kohlman for appellant in No. 85–5600.

Michael W. Farrell, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. and E. Lawrence Barcella, Jr., Asst. U.S. Atty., were on brief, for appellee in No. 85–5277 and 85–5600.

Before STARR, Circuit Judge, WRIGHT and MacKINNON, Senior Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

Appellants Robert Sutton, who resold crude oil, and Mark Sucher, an employee of the Department of Energy ("DOE"), were convicted of various criminal offenses [1] for their roles in a complicated conspiracy to bribe federal officials in order to obstruct a DOE investigation of Sutton's companies for noncompliance with price regulations, and to gain confidential information relat-

---

1. The indictment contained five counts:
 Count I—Conspiracy to commit bribery, 18 U.S.C. § 371;
 Count II—Bribery of public officials, 18 U.S.C. §§ 2, 201(b);
 Count III—Interstate transportation in aid of racketeering, 18 U.S.C. §§ 2, 1952(a)(3);
 Count IV—Acceptance of a bribe, 18 U.S.C. § 201(c);
 Count V—Causing others to travel in interstate commerce to promote bribery, 18 U.S.C. §§ 2, 1952(a)(3).
 The conspiracy allegedly began "[f]rom in or about April 1, 1980 and continu[ed] through in or about June, 1980." Count I. Sutton was charged in all counts of the indictment except Count IV. Sucher was charged in Counts, I, III, and IV. Counts II, III, and V charged defendants as principals under 18 U.S.C. § 2. Both defendants were convicted as charged. Sutton was sentenced to a four year prison term to run concurrently with the sentence he presently is serving for obstruction of justice, five years probation, and a fine of $105,000. Sucher received a two year prison term, three years probation, and a fine of $15,000.

ing to DOE settlement negotiations. On appeal Sutton and Sucher assign several grounds as reversible error. Finding none, we affirm the convictions.

## I. BACKGROUND

### A. *Facts*

Robert Sutton was engaged in the business of reselling crude oil through the corporate entity BPM Ltd., operating out of Oklahoma (BPM Oklahoma), California (BPM California), and the Bahamas (BPM International). Sutton and his affiliated companies were allegedly among the largest violators of DOE price regulations pertaining to the certification and resale of crude oil.[2] In response to civil and criminal investigations by the Department of Energy and the Department of Justice, Sutton became involved in a labyrinthian conspiratorial effort to bribe officials of the federal government, hoping to gain confidential information and to improperly influence government settlement negotiations.

The conspiracy included Sutton, at least four intermediaries, and Mark Sucher, a trial attorney in the Office of Special Counsel at the Department of Energy. The four intermediaries in the conspiracy were: Andrew Gazzara, Sutton's employee in charge of the California operation and the conspirator who apparently had Sutton's ear for much of the duration of the conspiracy; Myron Maxwell, a Florida businessman who brought the conspirators together in the first instance and seemed to coordinate matters along the way; Thomas Peacock, a Washington lobbyist, who was a former employee at DOE and an old friend of Maxwell; and Shelley Kolbert, a high-ranking administrative official in the Office of Special Counsel at DOE. Each of these four conspirators testified at trial for the prosecution pursuant to plea negotiations.[3] According to the government, Sucher received bribe money originating with Sutton in exchange for admittedly passing information and confidential DOE documents to Shelley Kolbert intended for Sutton.

Sutton and Gazzara began doing business together in the late 1970's reselling crude oil. In 1978 the DOE began investigating alleged violations of DOE price regulations by Sutton's companies. By late 1979 DOE had prepared criminal referrals—DOE documents that contained evidence of potential criminal liability—on the Sutton operations to be forwarded to the Department of Justice for possible federal criminal prosecution.

Through one of Sutton's business associates, Gordon Margulis, Maxwell learned in late 1979 of Sutton's difficulties with the Department of Energy (Tr. 490). Maxwell claimed to have a contact in the District of Columbia, a lobbyist who had prior experience with the DOE (Tr. 491). After speaking with Margulis, Maxwell called his Washington contact, Tom Peacock, stated the nature of Sutton's troubles with DOE, and asked whether Peacock could help. Peacock replied that he could help Sutton. Maxwell passed the information to Margulis, who set up a meeting for Sutton and several of his associates with Maxwell and Peacock in Washington, D.C. Peacock ar-

---

**2.** The DOE investigation led to a civil suit alleging violations of approximately 1.2 to 1.3 billion dollars (Tr. 1487). The DOE price regulations allowed higher prices to be charged for old oil than for new oil (whether oil was characterized as "old" or "new" depended on the date that it was taken from the ground). There was thus money to be made, albeit illegally, from having new oil certified as old oil and selling it at the higher price that could permissibly be charged for the latter (Tr. 1475).

**3.** Gazzara, Maxwell, and Kolbert were indicted for their roles in the conspiracy, and they pled guilty prior to trial. Maxwell and Gazzara pled guilty to one count of conspiracy to bribe a government official. Both men were awaiting sentencing at the time of trial. Kolbert pled guilty to one felony count of accepting a bribe and one misdemeanor count of tax evasion. He received concurrent terms of three years and one year imprisonment, and a fine of $30,000. Kolbert's prison term was reduced after the trial of Sutton and Sucher to one year. Peacock was not indicted in the present conspiracy, but pled guilty to an obstruction of justice charge arising from his role in an unrelated insider trading scheme. He received a sentence of two years probation, 200 hours of community service, and a fine of $5,000.

ranged for Sutton to meet with former Senator Walter Flowers in February 1980, although Sutton ultimately decided against using the services of Flowers' lobbying firm.

After it had become apparent that Sutton was not interested in using Flowers' lobbying firm, Peacock, following several conversations with Maxwell (Tr. 751), contacted Shelley Kolbert sometime in the spring of 1980. Peacock told Kolbert "that these people wanted help and [that] there was money to be made." (Tr. 753). Kolbert's testimony regarding the same conversation was more descriptive:

> [Peacock said,] "Hey I've got something that I think we can make a really big score on." ... He said that he had a client that was interested in getting some information out of the Department of Energy. More specifically, a client that was interested in getting information out about an investigation of a firm within the Department of Energy.
>
> ... [T]he client's name was Mr. Robert Sutton.
>
> . . . . .
>
> And [Peacock] said that if there was anything that I [Kolbert] could do to assist him, that it would be worth my while and that any moneys which he received for these services would be split on a 50–50 basis.

(Tr. 1079–80).

Kolbert, who was not a lawyer, was then employed in an administrative capacity in the Office of Special Counsel at DOE, but did not have personal access to information relating to the Sutton investigations (Tr. 1084). Kolbert thus immediately contacted Mark Sucher, who was then employed as a trial attorney in the division of the Office of Special Counsel charged with investigating possible willful or criminal violations by the thirty-five largest oil refiners.[4] Kolbert testified:

> I told Mr. Sucher that I had a friend, whom I didn't name, who had a client that was interested in getting some information out of the Department of Energy dealing with certain of the investigations dealing with an oil company.... Well, *I told him that this friend was willing to pay for the information.*
>
> ... I told him that the principal interest that was stressed by Mr. Peacock was a company or companies dealing with a Mr. Robert Sutton.

(Tr. 1084) (emphasis added). *Sucher* then explained to Kolbert who Sutton was and why the Sutton investigation was regarded as important to DOE (Tr. 1085). Kolbert's understanding of the meeting was clear:

> At that first meeting [with Sucher], it was my idea that we would provide Mr. Peacock ... information on a company which wasn't Mr. Sutton's company, but just something to show that, in fact, timely information could be gotten by us and given to him, in other words, on another company, a company which was totally unrelated, basically as a show document to aid Mr. Peacock in his negotiations with his clients.
>
> . . . . .
>
> ... I told Mark [Sucher] that *we* would be receiving money for this and that was pretty much the sum total of the meeting.

---

4. Sutton's companies were not among the thirty-five largest oil refiners, and hence not directly within the jurisdiction of the Office of Special Counsel, where Sucher worked. Sutton's companies, and all oil companies other than the largest thirty-five, were monitored by the Office of Special Investigations. However, according to the testimony of the persons in charge of these respective offices, in many investigations there were areas of considerable overlap. Attorneys from the Office of Special Counsel and the Office of Special Investigations therefore met regularly to apprise one another of matters of mutual concern. Mark Sucher was one of the attorneys from the Office of Special Counsel assigned to be involved in these "joint investigations" (Tr. 1409, 1488–89). According to the detailed testimony of Jeffrey Whieldon, Deputy Solicitor of the Office of Special Counsel and Sucher's supervisor, Sucher had access to the specific documents involved in the conspiracy alleged in this case, as well as access generally to the kinds of documents involved in joint investigations (Tr. 1365–1416). Jerome Wiener, Director of the Office of Special Investigations, testified in accord (Tr. 1472–74, 1488–91, 1512).

(Tr. 1085–87) (emphasis added). Shortly after this meeting, according to Kolbert, Sucher called to verify his ability to retrieve documents relating to the Sutton companies (Tr. 1088).

Acting on the assumption that money would be forthcoming, Peacock began to receive from Kolbert information pertaining to audit reports, grand jury activities, and the possibility of settlement (Tr. 754–55). Peacock relayed the information to Maxwell and transmitted Maxwell's questions to Kolbert (Tr. 756). Kolbert testified that his source of information was Mark Sucher (Tr. 1090–91).

A short time later Kolbert went to Peacock's office to find out whether Sutton's money would be forthcoming. Kolbert testified that Peacock telephoned Maxwell, while Kolbert was in the room, and said, " 'Concerning the oil deal, I think we can do some good for your people, but it's going to cost you some money.' " (Tr. 1089). Peacock then covered the receiver and asked Kolbert how much it would cost. When Kolbert did not give a figure, Peacock suggested $25,000, saying to Maxwell, " 'It is going to cost $25,000, because people need to be paid for their services.' " (Tr. 1089–90). Peacock's account of his conversation with Maxwell differed somewhat. Peacock testified that Kolbert stated a need for $10,000 "to take care of people in government that were giving him [Kolbert] information" (Tr. 757). While Peacock had Maxwell on the telephone, Kolbert added $5,000 for himself and Peacock did likewise. Peacock thus asked Maxwell for $20,000 (Tr. 757). Maxwell told Peacock that he intended to keep $5,000 for himself, pushing the figure up to $25,000 (Tr. 498–99). Peacock told Maxwell that the money was necessary "if you [Maxwell] want to keep the information going" (Tr. 754). At this meeting Kolbert also provided Peacock with a summary of the type of documents that he could take from the Department of Energy. Kolbert had earlier been briefed on this subject by Mark Sucher (Tr. 1091).

Maxwell thereafter contacted Gordon Margulis, who recommended that Maxwell contact Andrew Gazzara in order to get money from Sutton. Through Gazzara, Maxwell requested $40,000 from Sutton "to start getting the ball rolling in Washington" (Tr. 76). Maxwell testified that, contrary to his conversation with Peacock, he intended to keep $20,000 (Tr. 498–99). *Sutton* directed Gazzara to wire Maxwell money drawn from Gazzara's account with BPM California, and promised to reimburse Gazzara. Gazzara wired $40,000 to Maxwell in Florida on May 6, 1980; Maxwell caused $20,000 to be wired to Peacock in the District of Columbia on May 7, 1980 (Tr. 760). The latter wire transfer was the basis of Count III of the indictment. Peacock endorsed a check on May 7, 1980 for $20,000 cash, from which he gave Kolbert $15,000. Contrary to Kolbert's understanding with Peacock, however, Kolbert kept $10,000 (Tr. 1109). Kolbert testified that he gave defendant Sucher $5,000 cash in a white envelope in Kolbert's Washington office at DOE (Tr. 1111). Counts II and IV of the indictment were based on these payments to Kolbert and Sucher.

Kolbert testified that, in his initial conversation with Mark Sucher, he had come up with the idea of providing a confidential DOE document to Peacock "to show that, in fact, timely information could be gotten by us and given to him, in other words, on another company, a company which was totally unrelated, basically as a show document to aid Mr. Peacock in his negotiations with his client" (Tr. 1085–86). Kolbert therefore asked Sucher to retrieve a current, confidential DOE document (Tr. 1095). Sucher returned with a criminal referral and supporting audit on Vantage Petroleum, dated April 17, 1980. Sucher asked Kolbert about money; Kolbert said that a total of $25,000 would be paid for documents, though he claimed to be unsure how that amount would be divided (Tr. 1096).

Kolbert studied the Vantage document and took it to Peacock's office, where Peacock photocopied it. Kolbert testified that Peacock said the Vantage document would

be "helpful in getting them [Sutton] to come across with their end of the proposition" (Tr. 1100). In other words, Peacock considered that the Vantage document would be useful in Peacock's negotiations for more money from Sutton. Peacock later called Kolbert to confirm that the Vantage document had been helpful (Tr. 1101).

Peacock passed the Vantage document to Maxwell, who in turn passed it to Gazzara. Gazzara testified that, prior to his receipt of the Vantage document, he had been pressured by defendant Sutton to show some tangible results of Sutton's outlay of $40,000. Gazzara accordingly had been calling Maxwell (Tr. 84). On cross-examination, Gazzara testified that he had specifically requested documents relating to Vantage Petroleum in order to appease Sutton and to test the ability of Maxwell's contacts in Washington to gain confidential information from the Department of Energy (Tr. 203).[5] Gazzara testified that he "showed [the Vantage document] to Mr. Sutton and Mr. Sutton ... kept it quiet because he saw something that came out of the government. That was that." (Tr. 287). Peacock testified that Maxwell had specifically mentioned documents relating to Vantage Petroleum as being of interest to Sutton (Tr. 770). Maxwell and Kolbert had no recollec-

tion of making a specific request for Vantage documents (Tr. 636, 1191–92).

Maxwell was also told by Peacock to direct Sutton to contact Alex Peters, a Washington attorney. Maxwell did not recall being given any reason why Peters should be hired, and had little contact with Peters (Tr. 537–38). Peacock testified that Sucher drew attention to Alex Peters in the spring of 1980, indicating that Peters was an attorney with experience in energy matters who Sutton could hire to negotiate with the Department of Energy (Tr. 764). Peters testified that *Sucher* telephoned him the morning of May 7, 1980—the same day that Maxwell wired $20,000 to Peacock (Tr. 760)—to ask whether Peters was interested in taking a case involving the DOE regulations concerning the resale of crude oil. In response to Peters' questions, Sucher stated that neither he nor his office was involved (Tr. 999).[6] Peters then indicated his interest in the case, and Sucher said that a "Ray Sutton" would call (Tr. 999). Defendant Robert Sutton telephoned Peters that afternoon, and agreed to hire Peters on retainer (Tr. 1000). Thereafter Peters contacted the Department of Justice attorney working on the Sutton investigation, and spoke with Sutton on the telephone approximately ten to twenty times (Tr. 1002). On June 16, 1981 Peters had a

---

5. Gazzara testified:
> ... I asked Mr. Maxwell if he had any pull in Washington, could he get me some information on Vantage Petroleum because I heard that Vantage Petroleum had a problem in New York.... [W]e were looking at ... the possibility of buying the company, and if he [Maxwell] had any, any pull that he was supposed to have in Washington, this would satisfy Mr. Sutton.

(Tr. 172–73). Gazzara explicitly identified *Sutton* as providing the impetus for the request for a show document:
> [Sutton would say] [h]ey, what is going on, you are paid money ... I want to know this and that.... I would call Maxwell and say Max, what are you doing, you got paid $40,-000, what are you doing for the $40,000.... So I told Maxwell ... you are putting this all on me, I am getting heat from him [Sutton], if you are going to do something, do something, if you are not, let's forget it because I don't want to hear it no more. He says well, I am going to show you something.... I said if

you are going to show something, I want a Vantage, if they are involved in a federal appeal.

(Tr. 286–87).

Kolbert's testimony implied that the Vantage "show documents" were to be given to Sutton as an inducement for Sutton's payment (Tr. 1090). It is unclear whether Kolbert considered the Vantage document to be an inducement for the initial payment in May 1980 or the subsequent payment in December 1980, though the mention of the "show documents" was contemporaneous with the request for $25,000 "because people need to be paid for their services." Sucher had previously "briefed" Kolbert "on the type of documents which could be gotten from the Department of Energy" (Tr. 1090).

6. In fact, Sucher and his office were very much involved in the Sutton investigation, according to the testimony of Jeffrey Whieldon, Deputy Solicitor of the Office of Special Counsel (Tr. 1365–1416).

conversation with Gazzara that he considered "cause for concern":

> [Gazzara] again suggested that Mr. Sutton th[e]n wanted me to approach DOE, as opposed to DOJ, and he wanted me to try to convince the Justice Department to try to kick the case back to DOE. He indicated to me something like the matter was all set up and under control. I remember that specifically because I asked my secretary to type that telephone conversation.

> . . . . .

> I indicated to [Gazzara] if he thought he was setting something up over the Department of Justice, I wasn't interested in being a part of it.

(Tr. 1005–06). Gazzara denied any impropriety at the time. Peters asked Mark Sucher on several occasions how, or from whom, Peters had received the referral in the Sutton case. Peters testified that Sucher refused to divulge the information, referring to the person only as the "guardian angel" (Tr. 1011).

Kolbert testified that Sucher had indicated from the start that Sutton's attorneys did not have the right approach to dealing with the government (Tr. 1131). The importance of counsel became apparent to Kolbert in the fall of 1980 when Peacock told Kolbert that Sutton was willing to pay "a tremendous amount of money ... $100,000 for the attempt and a quarter of a million dollars if successful" in return for influencing the settlement process (Tr. 1128). Kolbert told Peacock of Sucher's recommendation of Alex Peters, and Peacock said that he would exaggerate the situation to tell Maxwell that Sutton must employ Peters in order to effect a settlement with the government (Tr. 1132). Sucher informed Kolbert that the government thought that it had a good case against Sutton, and also discussed the magnitude of the alleged violations by Sutton's companies. Kolbert and Peacock apparently thought that they could make considerable money from Sutton by providing at least the appearance of involvement in the settlement process.

Kolbert and Peacock therefore spoke with Maxwell on numerous occasions about the Sutton case, Peacock passing along information from Kolbert that Kolbert had received from Sucher. On one occasion Kolbert passed himself off as a DOE attorney in a telephone conversation with Maxwell from Peacock's office (Tr. 1136). Kolbert spoke generally about the settlement process, using information that he received from Sucher (Tr. 1125–30). Gazzara testified that Sutton was particularly interested in obtaining the removal of a Department of Justice attorney, Sauber, and an FBI agent, Zeringue, from the investigation (Tr. 92–93). However, Kolbert denied at trial that any steps were taken to improperly influence the investigative process.

In approximately December 1980 Kolbert put Peacock in touch directly with Mark Sucher, so that relevant information could be communicated without the mediation of Kolbert (Tr. 1149). Kolbert testified that he specifically instructed Sucher not to reveal to Peacock Sucher's role in providing the documents: "I felt this was a great breach of security and would jeopardize all of us.... I also didn't want Mark [Sucher] and Tom [Peacock] to compare notes as to what money had passed between them because I [Kolbert] had taken the lion's share." (Tr. 1150).

The steady flow of internal DOE documents played an important role in the conspiracy between May and December of 1980. Even prior to passing the Vantage document, Kolbert instructed Sucher to begin collecting confidential DOE documents relating to Sutton, specifically criminal referrals and backup audit reports. Kolbert testified that he tried to alleviate Sucher's concern about the security of the documents. Sucher told Kolbert that he had assembled the Sutton documents by taking them from the files, photocopying them, and returning them to the files (Tr. 1103–04). According to Kolbert, the common thread throughout these documents was that Sutton's companies were somehow involved (Tr. 1105). Kolbert testified that the bulk of the confidential documents

were passed to Peacock sometime in May 1980, although documents supporting the criminal referrals were passed up the chain as they became available throughout 1980 (Tr. 1112).

In December 1980 Maxwell travelled to Washington to receive the Sutton documents from Peacock, which Peacock represented contained "the whole game plan [of DOE] against Mr. Sutton and BPM" (Tr. 508). In his office, Peacock drew a diagonal line across each page of the documents and instructed Maxwell to show the documents to Sutton, and not to lose sight or possession of the documents (Tr. 509).

Maxwell then flew to California on December 10, 1980 to meet Gazzara. Gazzara placed in his safe the documents carried by Maxwell, after he photocopied them without telling Maxwell (Tr. 94–95). On December 12, 1980 Maxwell and Gazzara flew to New Orleans. Maxwell and Gazzara met with Sutton in Gazzara's hotel room, where Maxwell explained to Sutton that the documents contained "the Department of Energy's game plan against him as far as what any trial would be" (Tr. 510). Gazzara testified that Sutton looked over the documents and stated that " 'my lawyers can get this in discovery,' " to which Maxwell replied, " '[Y]ou haven't even gone before the grand jury and this is not discovery ... these came out of there and no lawyer.' " (Tr. 95–96). Gazzara testified that Maxwell asked Sutton for $350,000[7] during the same meeting, and Sutton said that he would think about it (Tr. 96–97). According to Gazzara, "At that time [Maxwell] told [Sutton] this money [$350,000] was going to be used to influence people in Washington in the government, in the Department of Justice. He [Maxwell] brought these things [documents] to show how much strength...." (Tr. 291).

Two days later Maxwell called Gazzara to reiterate his request for $350,000 "if anything is going to be done in Wash-

ington" (Tr. 98). Gazzara called Sutton, who this time authorized, through his comptroller, the transfer of the money. On December 15, 1980 $350,000 was wired by Sutton to the account of BPM California (Tr. 119). Gazzara transferred the money to his personal bank account.

On December 19, 1980 Gazzara met Maxwell in Las Vegas, where he gave $50,000 to Maxwell, laundering the money through the use of gambling chips (Tr. 99). Gazzara later wired Maxwell another $30,000 (Tr. 102).

On December 23, 1980 Maxwell, Peacock, and Kolbert met in the Key Bridge Marriott Hotel in Rosslyn, Virginia. Peacock arranged the meeting to distribute the money received from Maxwell, and to assure Maxwell that someone from the Department of Energy was working on the Sutton case. Kolbert and Maxwell sat separately in adjoining rooms, while Peacock stood in the common doorway. Kolbert and Maxwell were careful not to reveal their identities to one another. Maxwell brought $75,000 to be divided three ways, but Peacock suggested dividing only $50,000 three ways, with the remaining $25,000 to be divided between Maxwell and Peacock. The money was divided as Peacock suggested. Kolbert told Maxwell of his willingness to help other clients of Maxwell who might have trouble with the DOE (Tr. 520–25). The journey of Kolbert and Peacock from the District of Columbia at the bidding of Maxwell—acting on Sutton's behalf—formed the basis of Count IV of the indictment charging the acceptance of the bribe.

A few days later Maxwell received additional DOE documents from Peacock, which he placed in the trunk of his car. The car was subsequently repossessed by the leasing company with the confidential DOE documents still in the trunk. The documents were returned to Maxwell, but not before the repossessor photocopied

7. Gazzara testified that the $350,000 figure was suggested by Maxwell (Tr. 236–38). Maxwell testified that he called Gazzara to say that there was "a deal working," but that it would cost Sutton $150,000. According to Maxwell, Gazzara suggested, and Maxwell agreed, that they ask for $350,000 and split the extra $200,000 (Tr. 497).

them and gave them to the local police. The police forwarded the documents to the FBI (Tr. 534–35).

Some time thereafter, Gazzara fell from Sutton's favor and Kolbert was removed from the chain. Maxwell therefore began communicating directly with Sutton. In October 1981 Sutton was indicted for alleged federal criminal offenses relating to the sale of crude oil. The resulting trial was held in federal district court in Oklahoma. When Maxwell called Peacock with a question at about this time, Peacock instructed Maxwell to contact Sucher directly (Tr. 544). During the time of Sutton's indictment and trial in Oklahoma, Maxwell spoke on several occasions with Sucher generally concerning the strengths and weaknesses of the government's case and the level of experience of the government attorneys (Tr. 546). At one point Sutton's attorney gave Maxwell a specific question to ask Sucher (Tr. 546). Maxwell passed Sucher's answers along to Sutton. There was no allegation that Sucher received additional money for these acts.

Maxwell taped a telephone conversation with Sutton in early 1981 during the time of the federal grand jury investigation in Oklahoma. Maxwell stated that "[e]verything at this end looks good," but expressed concern for the money:

> [W]hat they're concerned about, and rightly so, as you know I guess, I put up what needed to be done. Uh, they want some kind of guarantee about the other, and I told them that I would talk to you, that if you said it I would go along with that and take your word for it.

Sutton replied, "[T]hat's no problem." (J.A. 25). Maxwell spoke to Sutton as if a deal had already been set up at the Department of Energy:

> [T]he way this is going to be, it's going to be first of all through the ... it's already handled there.... [W]hen we get the okay, you send your lawyer in, or whoever you choose, it doesn't even have to be a lawyer.... Go see somebody that you know is important and he'll give you the word.... But here's the t[h]ing,

you're not going to pay anything.... [Y]ou are going to get a clean bill of health to date.

(J.A. 28–29). Sutton indicated his understanding and consent throughout. When Maxwell again stated his concern for the money, Sutton confirmed his commitment to pay for influencing the settlement process and indicated that "we'll settle up over at ... the island [meaning Sutton's place in the Bahamas].... You know how it is over there ... their laws." (J.A. 30). Maxwell repeated his concern for the money, saying, "I have put up what needed to be put up in front.... I don't want to hear later that, you know, it could have been done without us." Sutton replied, "No, no, no, no." (J.A. 31).

Sutton was tried in 1982 in the Northern District of Oklahoma on criminal charges relating, *inter alia*, to alleged violations of DOE crude oil regulations. He was acquitted of all counts except for one count of obstruction of justice and one count of conspiracy to obstruct justice (J.A. 1–4). The conviction for obstruction of justice was based on his actions "counseling, advising and suggesting" to an employee to destroy records demanded by a subpoena issued by the DOE (J.A. 1). The conviction for conspiracy to obstruct justice resulted from his role in a conspiracy to prevent, through physical restraint and intimidation, two persons from speaking with investigators from the FBI and the Department of Justice (J.A. 2–4).

In 1983 an investigation by the Securities and Exchange Commission implicated Peacock in an insider trading scheme. Peacock thereafter agreed to cooperate with the government concerning the Sutton conspiracy. As a result, he subsequently taped, with the assistance of FBI agents, at least eleven conversations with Mark Sucher. In a conversation of October 25, 1983 Sucher told Peacock that he had retained counsel (J.A. 108). On October 26, 1983 Sucher expressed his concern over the investigation of Shelley Kolbert. Sucher initially told Peacock that "you don't wanna know," but then said, "[T]hey're, they're, I guess

you know because they're diggin' around with Shelly [sic]. I don't know where they're goin'..... And who said what to whom." (J.A. 118). Sucher told Peacock that he would prefer to ask questions through his retained counsel, because "tha[t] way we're both covered by talkin' through our attorneys" (J.A. 120).

On October 28, 1983 Peacock and Sucher had two conversations concerning the government's investigation of the conspiracy and the immunity given Peacock in return for his cooperation with the government (J.A. 156, 162). The most relevant part of the colloquy related to Sucher's virtual admission that he had passed documents to Kolbert:

> Peacock: My main concern was anything relating to documents.... It was you that I was worried about not me, they already got me pal. (Laughs).
>
> Sucher: Ahm. How good's your memory, awful about now right? Good. Ah, *well they're gonna get me too.*
>
> Peacock: *On documents?*
>
> Sucher: Um-hum.
>
> Peacock: Hmm, hmm, hmm, hmm. What'd you do, did you provide them for Shelley?
>
> Sucher: (Unintelligible).... I can't ask you to corroborate that.
>
> Peacock: Okay, all right, never mind, I'm sorry I even asked.
>
> Sucher: That's the wrong ques, I mean curiosity is one thing, but ...
>
> Peacock: Yeah okay.
>
> Sucher: ... reckless disregard of the life of a human being (unintelligible) ...
>
> Peacock: (Talking same time) Your [sic] right.
>
> Sucher: I mean because if, (PAUSE), if you know that they don't need me.

(J.A. 164–65) (emphasis added).

This last remark seems to have clarified an oblique remark made by Sucher earlier in the same conversation. Sucher had previously said, "And, when you're tryin' to bake a pie, sometimes you try to bake it from radiation from on top and sometimes you try to bake it with radiation from, from

below. It's an amazingly effective way to bake it, if it is baked from above and below." (J.A. 154). Peacock asked whether Sucher was the one who was being baked. Sucher replied that Peacock was missing the "whole point" because Sucher said, "I don't think I'd be the bakee" and he added, "They're baked 'em [sic] from above I don't wanna be stuck, being in a cold part of the oven." (J.A. 154). These remarks significantly indicate Sucher's awareness that any potential value that he might have as a government witness—and hence the potential leverage he might have in receiving immunity in exchange for cooperation with the government—depended on the timing of his request and the exclusivity of his knowledge of the events of the conspiracy. It is important to remember that Kolbert had been careful not to let Peacock know that Sucher had been the source of the confidential documents coming from DOE, because Kolbert had given Sucher $5,000 less than Kolbert had told Peacock he would give his unnamed source. As Kolbert stated at trial, "I also didn't want Mark [Sucher] and Tom [Peacock] to compare notes as to what money had passed between them because I had taken the lion's share." (Tr. 1150).

On November 18, 1983 Shelley Kolbert, in cooperation with government agents, taped a telephone conversation with Sucher. Sucher stated on several occasions that the government investigation was focusing on Kolbert and Peacock, although Sucher was, in his own words, "trying to be a little circumspect about it" (J.A. 173). Although Kolbert and Sucher were involved in other possibly illegal schemes, Sucher was particularly concerned with the Sutton matter (J.A. 174, 176). Sucher agreed with Kolbert's statement, regarding the Sutton case, that "it comes down to one person's word against another['s]" and stated that he considered the investigation "real close" (J.A. 176).

During the same conversation Kolbert stated, "I'm concerned about ahh, you know, the—the fact that you passed documents to me. That's what I'm concerned

about." (J.A. 178). Sucher replied, "They already know about that Shelley.... Well, from whatever source, they know that I gave you the documents. And as I recall (unintelligible) ... and I gave them to you and you gave them back to me." (J.A. 178–79). Kolbert remarked, "Unfortunately though I do remember ... precisely ... the one major thing [*i.e.*, passing documents [8]] dealing with Sutton...." Sucher replied, "That's the hook.... My guess then ... is that, before they come down on you they will try and go all the way, up the chain ta' Sutton.... And if they succeed in that then they'll come down on you and then come down on Sutton." (J.A. 179–80).

Sucher's role in passing documents was made clear in the same conversation:

> Sucher: Now I haven't talked to them but I think that they'll be able to place the documents in your hands.
>
> Kolbert: You think they will be able to place the documents in my hands? Will they be able—will they be able to place the link between you and the documents in my hands?
>
> Sucher: I don't know. Ahhm ...
>
> Kolbert: I mean we weren't monitored when you passed them to me were we?
>
> Sucher: No.

(J.A. 181–82). Later in the conversation Kolbert asked, "Do you think there's any possibility that ahh, there's been a ahh, any sort of tracing dealing with money?" Sucher responded, "No I mean, they can, try and look, for money in me all day, they won't find it.... I have a terrific talent." (J.A. 184). Near the end of the conversation the following exchange took place:

> Kolbert: [D]o you feel jeopardy for yourself?
>
> Sucher: There may be some. But mainly having to do with the, ahh, Sutton matter and that's about it.
>
> Kolbert: That's major jeopardy.
>
> Sucher: Yeah, I understand but ...

> Kolbert: I mean ... isn't that felonious? ... If there's a way it can be proved....
>
> Sucher: You have to prove intent. (J.A. 185–86).

### B. *Proceedings*

Sucher was arraigned October 15, 1984. He demanded a speedy trial under 18 U.S.C. § 3161 *et seq.*, which guarantees trial within 70 days of arraignment. The court set a trial date of November 30, 1984, but on November 29, 1984, because of the receipt of additional evidence, the government dismissed the indictment and returned a superseding indictment that included Sutton as co-defendant. Trial commenced January 4, 1985, concluding February 14, 1985. The jury found both defendants guilty as charged. Sutton received a four year prison term to run concurrently with the sentence he presently is serving for obstruction of justice, five years probation, and a fine of $105,000. Sucher received a two year prison term, three years probation, and a fine of $15,000.

### II. ROBERT SUTTON

Sutton challenges the sufficiency of the evidence to support his conviction as a principal on Counts II and III of the indictment, namely, bribery of public officials in violation of 18 U.S.C. § 201(b) and interstate transportation in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3). In addition, Sutton challenges the trial court's evidentiary ruling that permitted the government to introduce evidence of Sutton's prior convictions for obstruction of justice and conspiracy to obstruct justice. Finally, Sutton claims that his Sixth Amendment right to confront witnesses was abridged by the trial court's restriction of Sutton's cross-examination of Kolbert. Each claim is analyzed below.

### A. *Sufficiency of the Evidence*

■ Sutton challenges the sufficiency of the evidence from which the jury could

---

**8.** Kolbert testified that he intended the phrase "one major thing" to mean "[t]he passing of documents and the receiving of money" (Tr. 1158).

have convicted him of bribery of public officials, 18 U.S.C. § 201(b), and interstate transportation in aid of racketeering, 18 U.S.C. § 1952(a)(3). He unsuccessfully moved for judgment of acquittal. Our task in reviewing denials of motions for acquittal is to view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the jury to determine the weight and the credibility of the evidence. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Singleton,* 702 F.2d 1159, 1163 (D.C.Cir.1983); *United States v. Fench,* 470 F.2d 1234, 1242 (D.C.Cir.1972). "If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make." *Curley v. United States,* 160 F.2d 229, 237 (D.C.Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947). Moreover, no legal distinction exists between circumstantial and direct evidence. *See Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954). It is readily apparent that there is ample record evidence from which the jury could reasonably have found Sutton guilty as charged, and that the trial judge correctly denied Sutton's motion for judgment of acquittal.

Counts II and III of the indictment resulted from the wire transfer of $20,000 on May 7, 1980 from Maxwell in Florida to Peacock, Kolbert, and Sucher in Washington, D.C. Specifically, Count II charged that Sutton "corruptly did give, offer and promise a thing of value, that is an aggregate of $15,000 to Shelley Kolbert and Mark A. Sucher ... with intent to influence official acts and to induce them to do acts in violation of their lawful duties." Count III charged that Sutton, Gazzara, and Sucher

did use and caused to be used a facility in interstate commerce, that is they did cause $20,000 to be wire transferred from Daytona Beach, State of Florida to Washington, District of Columbia, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is bribery in violation of Title 18, U.S.C. § 201(b) and thereafter did perform and attempt to perform acts ... in carrying on said unlawful activity.

Sutton was charged and convicted as a principal under 18 U.S.C. § 2,[9] a very broad statute.

Sutton significantly does not challenge the very fact of the wire transfer or the resulting bribe to Kolbert and Sucher. Rather, Sutton challenges the sufficiency of evidence from which the jury could have determined that he intentionally authorized the transfer of money to be used for bribery. Sutton contends that the money was authorized only to be used for legitimate lobbying purposes, and points to Gazzara and Maxwell, who testified explicitly that, at the time of the initial payment to Peacock, they both considered the money to have been authorized for legitimate activities. Sutton Brief at 9–10.

■ There was thus no direct evidence of Sutton's intent at the time of the transfer, although there was considerable circumstantial evidence from which a jury could infer Sutton's knowledge that the money would be used to bribe government employees. To reiterate briefly: Sutton and several associates met in Washington in the latter part of 1979 with Maxwell, Peacock, and the lobbying firm of former Senator Flowers. The jury was not told in detail about these meetings, but it is undisputed that Sutton decided against using the services of the Flowers' lobbying firm. Neither Maxwell nor Peacock had signifi-

---

9. 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

cant contact with Sutton on this trip. Gazzara became involved in the conspiracy when Maxwell forwarded Peacock's request for $40,000 to "get the ball rolling in Washington." As mentioned above, both Gazzara and Maxwell testified that they had no knowledge of illegality at the time of payment.

Yet the jury knew, for example, that the date of the wire transfer of $20,000 was May 7, 1980. Not coincidentally, this was the same day that Mark Sucher, whose intervention could not be described as fortuitous, called Alex Peters in the morning to say that a "Ray Sutton" would contact him with regard to possible representation. Robert Sutton contacted Peters that very afternoon.

The role of the Vantage Petroleum document is also very significant. Gazzara testified that he specifically asked for a show document on Vantage Petroleum in order to learn something about a competing oil company as well as to test the reach of Peacock's contacts in the Department of Energy. Gazzara testified that Sutton prompted him to show some tangible evidence of his expenditure of $40,000. Gazzara therefore testified that the passing of the Vantage document occurred after the payment to Peacock. However, Kolbert's testimony was less clear on the timing of the passing of the Vantage document; he testified that the Vantage document preceded the request by Peacock of $40,000. Indeed, evidence was presented that Gazzara had conversations of a hostile nature with officers of Vantage Petroleum in late April of 1980, prior to the wire transfer of money. These conversations provide a motive for obtaining the Vantage document, from which the jury could reasonably have inferred that the Vantage document was requested specifically by Sutton's agent Gazzara.

Whether the Vantage document was passed before or after Sutton authorized payment of $40,000 presented a jury question of the credibility of the witnesses. However, either resolution allows a reasonable inference of Sutton's criminal intent: If Sutton paid in advance, he simply received illegally what he expected in the form of the Vantage document; conversely, if the Vantage document preceded payment, then the subsequent $40,000 was clearly paid by Sutton with the intent illegally to procure confidential documents. The testimony of Gazzara tends to imply the former explanation, Kolbert's testimony the latter. The jury was free to choose among the two versions, or to accept both as representing the understandably imperfect recall of witnesses nearly five years after the relevant events. The central theme of the testimony in any event is that the Vantage document directly corresponded to the receipt of money from Sutton.

Sutton attempts to explain away the Vantage document as being the product of a separate conspiracy organized by Gazzara. Again, circumstantial evidence suggests otherwise. Gazzara testified unequivocally that Sutton reviewed the Vantage document and "kept it quiet because [Sutton] saw something that came out of the government" (Tr. 287). The only reasonable inference from this episode is that Sutton was receiving exactly the kind of confidential information that he expected to receive through his dealings with Maxwell and Peacock. Sutton certainly took no steps to persuade the other conspirators to stop their activities because he intended only legal lobbying activities to occur.

The jury, moreover, heard testimony from Paul McBride, Sutton's former attorney and confidant. McBride testified that he and Sutton were in regular contact during 1979 and 1980 on matters beyond the attorney-client relationship. McBride stated that Sutton had said in the fall of 1979 that lawyers were "dumb" for recommending a settlement with the Department of Energy, because "there were other ways to take care of this thing that were less expensive and that he [Sutton] had a direct approach to handle it.... He [Sutton] could send the green directly to Washington and take care of this problem." (Tr. 468–69). Sutton emphasized that "for 30—40—or $50,000 he could have this whole

matter taken care of and the investigation would be dropped" (Tr. 469).[10]

Sutton admittedly authorized $350,000 to be paid in December 1980 following the December 12 meeting with Maxwell in New Orleans at which Sutton was shown the bulk of the DOE documents concerning his companies. Moreover, in the telephone conversation between Maxwell and Sutton, Maxwell claims to have "put up what needed to be done" and "put up what needed to be put up in front" (J.A. 25, 31). Sutton's responses throughout could reasonably be construed to indicate that all these payments were being handled as he had intended.

Finally, the jury received evidence of Sutton's convictions in the Oklahoma trial for obstruction of justice and conspiracy to obstruct justice. Since in the present counts Sutton was charged with an attempt to obstruct the investigations of the Department of Energy and the Department of Justice into Sutton's companies, *see infra*, the jury could reasonably have concluded that his prior convictions were probative of Sutton's intent to use illegal means to subvert the government's investigation.

In both cases, there seems to have been a consistent pattern of attempts by Sutton to illegally subvert the enforcement of federal law, beginning with his efforts to obstruct the criminal investigations that led to this trial in Oklahoma, continuing with his payment of $40,000 to the other conspirators and the subsequent receipt of government documents and information, and extending through his payment of $350,000 in exchange for what he knew to be unlawful influence to settle his cases with the Department of Energy and the Department of Justice. There was simply no evidence of discontinuity in these events, only the single-minded attempt to escape, by whatever means, the accountability required by federal law. The jury thus could reasonably have concluded beyond a reasonable doubt that Sutton deliberately intended to bribe

government officials with the payment of $40,000.

## B. *Prior Convictions*

As mentioned previously, Sutton was convicted in the 1982 Oklahoma trial of obstruction of justice, 18 U.S.C. § 1505, and conspiracy to obstruct justice, 18 U.S.C. § 371. Over the objections of Sutton's trial counsel, the government introduced evidence of these convictions through a redacted copy of the indictment, a copy of the judgment and conviction, and the brief testimony of an FBI agent who had worked on the prior case (Tr. 1492–1511, 1616).

■ It is imperative that a criminal jury consider only those things that directly relate to the guilt or innocence of the accused as charged in the indictment. As stated recently by Judge Tamm, "A fundamental tenet in our criminal jurisprudence is that a jury should not premise its verdict upon a general evaluation of the defendant's character but rather upon an assessment of the evidence relevant to the particular crime with which the defendant is presently charged." *United States v. Lavelle*, 751 F.2d 1266, 1275 (D.C.Cir.1985); *see United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir.1980). Federal Rule of Evidence 404(b) provides:

> (b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b). Of course, even if evidence of other crimes is admissible under Rule 404(b), it may still be excluded by Rule 403's ban on otherwise relevant evidence whose "probative value is substantially outweighed by the danger of unfair

---

**10.** It was for the jury to determine whether this statement implied payment for retaining competent counsel or for improperly influencing government officials.

prejudice, confusion of the issues, or misleading the jury."

Sutton's challenge to the government's use of the prior convictions is forthright. He contends that his conviction for conspiracy to obstruct justice "has absolutely nothing to do with any of the participants or events in the instant case," and that the obstruction of justice conviction "had nothing to do with bribery or influence of any Governmental officials and certainly nothing to do with any of the participants in this indictment [the present case]." Sutton Brief at 12. Introduction of this evidence, Sutton contends, "essentially allowed the Government to infer and argue that since Sutton was a bad character who could commit criminal acts and therefore that he must have acted criminally in this case. That if he would commit other crimes to benefit himself then he must have committed bribery." *Id.* at 12–13.

■ Sutton's argument is misplaced. He argues that the convictions from the 1982 Oklahoma trial had "nothing to do" with the events of the present trial, yet the Oklahoma trial determined, *inter alia*, that Sutton would be held criminally liable for his alleged violations of DOE price regulations and other business practices allegedly in violation of federal law. These charges were the direct result of the DOE investigation that Sutton later allegedly attempted to influence illegally, as charged in the present case. We must keep in mind that there was only one DOE investigation, with separate criminal trials resulting therefrom, one in Oklahoma and this one later in the District of Columbia. That the prior convictions did not involve bribery of government officials or any of the co-conspirators in the present case does not render the prior convictions *irrelevant* to the question whether Sutton again would knowingly or intentionally adopt illegal means to block the same DOE investigation.

Indeed, the prior convictions were highly relevant to proving just those things that Rule 404(b) explicitly mentions—"motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." This is particularly the case in light of Sutton's defense at trial. There, his counsel argued that Sutton had been the unwitting victim of a conspiracy perpetrated by Maxwell and Gazzara to take extraordinary amounts of money under the pretense of providing legitimate lobbying efforts and participating in legitimate settlement efforts (Tr. 27–50). Thus, it was crucial for Sutton to argue that he had no knowledge that the two transfers of money ($40,000 and $350,000) were to be used for payments to government officials.

We consider that the trial court quite correctly determined that Sutton's prior convictions could be considered to represent just two of several schemes—including among them the conspiracy involved in the present case—to thwart the investigation of the Department of Energy.[11] Since such evidence can provide proof of Sutton's knowledge and intent at the time he authorized the payment of money, such evidence was relevant and admissible under Rule 404(b).

■ As with all otherwise admissible evidence, prior convictions must satisfy the balancing test of probative value versus prejudicial effect embodied in Rule 403. In assessing the probative value of other acts evidence, this court has considered, *inter alia*, the similarity and temporal distance of the acts, and the government's need for the evidence. *See United States v. Lavelle*, 751 F.2d 1266, 1277 (D.C.Cir.1985) (citing cases). Sutton's prior efforts to obstruct the DOE investigation involved different persons and did not involve bribery, yet they were similar to elements of the conspiracy alleged in the present case inso-

11. The trial judge said to Sutton's attorney:
The fact remains, however, that [the prior] conviction[s] related to the acts of this defendant in connection with the very investigation of oil regulations which are at issue here. This was just another, arguably, device that was utilized by these defendants in order to suppress, derail or otherwise confound that particular investigation.
(Tr. 1506–07).

far as the earlier efforts illegally attempted to block a single DOE investigation. Moreover, the prior convictions concerned events that had occurred at most only eighteen months prior to the events alleged in the present case, and some of those events occurred contemporaneously with events alleged in the present conspiracy. Finally, in lieu of direct evidence of Sutton's intent at the time of the first payment of money in May of 1980, it is clear that the government had an actual need to introduce Sutton's prior convictions as evidence of his intent and knowledge.

Furthermore, the government and the trial court scrupulously tried to avoid the unfair prejudice that could have attended the introduction of Sutton's prior convictions. The jury was given copies of the two counts of the indictment and heard them identified by an FBI agent who had worked on the investigation, and the court twice instructed the jury of the limited purpose of such evidence (Tr. 1617–18, 1977–78).[12] There was no significant discussion or inflammatory testimony about the actions underlying Sutton's prior convictions.

Sutton finally contends that the court failed to make the requisite on-the-record balancing of probative value versus prejudicial effect. See United States v. Moore, 732 F.2d 983, 987 (D.C.Cir.1984). However, reversal or remand for failure to make such a balancing on the record is inappropriate, first, if defense counsel failed to request such balancing, or, second, if the considerations germane to balancing probative value versus prejudicial effect are readily apparent from the record. See

United States v. Lavelle, 751 F.2d 1266, 1279 (D.C.Cir.1985).

The trial transcript does not reveal a specific request for such an on-the-record balancing by Sutton's attorney, which is unsurprising considering the length at which this evidentiary point was debated: Sutton's attorney and the government argued the admissibility of Sutton's prior convictions for the entire morning session of February 8, 1985 (Tr. 1560–1612). The record fully reveals the considerations required by Rule 403's balancing test, and it is quite clear that the court correctly conducted the requisite balancing.

## C. *Right of Confrontation*

Sutton claims that he was denied the ability to effectively cross-examine Kolbert, thus breaching his Sixth Amendment rights. See Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). The trial court observed that Kolbert "was involved in a lot of activities which could be characterized as illicit or possibly illicit" (Tr. 1305). Mark Sucher joined Kolbert in several of these collateral schemes. However, Sutton's attorney was prevented from cross-examining Kolbert on such matters, even though they might have reflected on Kolbert's credibility as a witness. More important, the court ruled against Sutton's attorney inquiring into a drug importation *scheme* (not a conviction) between Kolbert and Mark Sucher, which Sutton contends would have shown a motive, other than bribery, for Kolbert's payment of $5,000 to Sucher. Sutton contended that Kolbert paid Sucher $5,000 to settle a previous debt from the alleged drug im-

---

12. In the limiting instruction to the jury immediately after the evidence was introduced the court instructed:

This evidence was admitted only for your consideration of whether it shows that the defendant had the intent to commit the offense for which he is now on trial, and whether or not the defendant had knowledge with respect to the illegal activity that was involved in efforts to avoid prosecution for oil regulation violations involved in this particular case. It is not to be considered by you as evincing

bad character or a criminal propensity on his part, but only for the two purposes for which I have indicated that it was admitted into evidence; namely, his knowledge of whether or not there was illegal activity occurring in connection with the case which is in trial before you and whether or not he intended that the activities that took place as to which you have heard evidence were for an illegal purpose.

(Tr. 1617–18).

portation scheme, not as payment for documents.

 The court carefully evaluated the arguments from attorneys for the government and Sutton (both of whom favored such cross-examination) and Mark Sucher's attorney (who opposed such cross-examination), and ruled against allowing cross-examination of Kolbert's putatively illegal activities other than those directly involved in the present conspiracy, because of the danger that testimony by Kolbert about illegal schemes involving Mark Sucher would unfairly prejudice Sucher before the jury. Moreover, the drug importation scheme, for which Kolbert allegedly owed Sucher money, is irrelevant to the issue of Sutton's guilt or innocence in the present case. As far as Sutton is concerned, it matters not why Kolbert paid Sucher, but only that Sutton intended to pay money to government officials—i.e., Kolbert or Sucher—in exchange for confidential documents and information. In light of the limited utility to Sutton of such questioning, the court properly acted within its sound discretion.

On the basis of the foregoing, we hold that Sutton's Sixth Amendment right to confrontation was adequately protected by the considered ruling of the court.

### III. MARK SUCHER

Mark Sucher raises four arguments on appeal. First, Sucher argues that his right to a fair trial was irreparably prejudiced by the court's refusal to grant Sucher's motion for severance under Rule 14 of the Federal Rules of Criminal Procedure. Second, he contends that the date of the trial violated the 70 day time limit of the Speedy Trial Act, 18 U.S.C. § 3161 et seq. Third, Sucher argues that the government's role in taping his conversations with Peacock and Kolbert, knowing after October 25, 1983 that Sucher was represented by counsel, violated his Sixth Amendment right to

counsel. Finally, Sucher argues that the trial court abused its discretion in refusing to permit the introduction of exculpatory statements made contemporaneously to portions of his taped conversations with Kolbert and Peacock that were introduced into evidence by the government.

### A. *Motion for Severance*

Sucher made an unsuccessful pretrial motion for severance,[13] on the grounds that the weight and venality of the evidence against Sutton would prejudice the jury against Sucher. *See United States v. Sampol,* 636 F.2d 621, 643–46 (D.C.Cir. 1980) (per curiam). Sucher points to the allegations that Sutton was involved in a violation of DOE price regulations to the tune of 1.2 to 1.3 billion dollars, and that much of the government's evidence concerned Sutton's illicit dealings with conspirators other than Sucher. Sucher further points to trial testimony that suggested, *inter alia,* that Sutton had become wealthy through violations of federal regulations, through bribes paid to foreign officials (Tr. 353–54), through extortionary business practices (Tr. 205–21), and evidence showing Sutton's payment of almost $400,000 in order to bribe government officials in this case. Sucher asserts, "The tidal wave of evidence surely drowned Sutton, but it created an undertow that caught appellant Sucher as well." Sucher Brief at 52. Compelling though the metaphor may be, Sucher's legal argument is unpersuasive. Sucher was drowned by other evidence which proved his *direct* involvement in the conspiracy and substantive offenses.

Trial court rulings on motions for severance will be disturbed only for an abuse of discretion. *See Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Daniels,* 770 F.2d 1111, 1115 (D.C.Cir.1985). Motions for severance are particularly sensitive in

13. Rule 14 of the Federal Rules of Criminal Procedure provides:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.

conspiracy cases because of the danger that the guilt of one defendant may be unjustly transferred to another. *See Kotteakos v. United States*, 328 U.S. 750, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946); *United States v. Mardian*, 546 F.2d 973, 977 (D.C.Cir.1976) (en banc).

Sucher relies on two prior decisions of this court, *United States v. Mardian*, 546 F.2d 973, 977 (D.C.Cir.1976) (en banc), and *United States v. Sampol*, 636 F.2d 621 (D.C.Cir.1980) (per curiam), but neither case supports a decision contrary to the trial court's ruling in this case. In *Mardian* we reversed the conviction of alleged Watergate conspirator Robert Mardian and ordered a new trial. Mardian argued that the trial court should have granted his original motion for severance because he, unlike all other indictees, had been named only in the conspiracy count. Moreover, Mardian was charged with participation only until June 21, 1972, in a conspiracy alleged to have continued until March 1, 1974. 546 F.2d at 977–78. At trial it became apparent that the prosecution would focus primarily on events that occurred after Mardian had left the conspiracy. Nevertheless, we held that Mardian had not shown an abuse of the trial court's discretion in denying the severance motion before the start of the trial. *Id.* at 979. However, we did reverse Mardian's conviction because, in addition to the foregoing, during the second week of the trial, Mardian's trial counsel unexpectedly had to be hospitalized and Mardian was required to continue without his lead attorney during the remainder of the trial that lasted approximately three months. Moreover, the government did not oppose Mardian's motion for severance after his first attorney was hospitalized. *Id.* at 979–81. Under the circumstances a new trial was granted.

In *Sampol* we reversed the conviction of Ignacio Novo Sampol for making false statements to the grand jury and misprision of a felony. 636 F.2d at 642. Ignacio Novo Sampol was tried along with two co-defendants who were charged with various crimes arising from the assassination of the former Chilean ambassador to the

United States, Orlando Letelier, and his American associate, Ronni Moffitt. We reversed the conviction of Ignacio Novo Sampol in that case because of the likelihood that the jury would confuse his guilt with that of his co-defendants. One of the reasons for our holding was that Ignacio Novo Sampol was not even named in the conspiracy count, in which his co-defendants "were accused of participating in an intentional and extremely violent assassination scheme, the gory details of which were described with extreme accuracy to the jury." *Id.* at 646. Moreover, we noted that "the vast *bulk* of the testimony concerned the crimes of conspiracy to assassinate and murder for which [the co-defendants] were being tried." *Id.* (emphasis in original).

■ The facts in the present case clearly distinguish it from *Mardian* and *Sampol*. Sucher was not tried with a co-defendant against whom the government's evidence was overwhelmingly damning. Rather, Sucher was named as a co-conspirator in three counts of a five-count indictment, and his actions were part and parcel of an ongoing attempt to obstruct the investigation of the Department of Energy. Sucher's participation was not limited to a brief portion of the conspiracy, but extended throughout the entire duration of the conspiracy. In fact, Sucher willingly communicated with Maxwell about Sutton's criminal trial in Oklahoma long after Kolbert and Peacock had dropped from the conspiratorial chain. In a sense, Sucher was the linchpin of the conspiracy since he was the source of the confidential documents and information that were used to impress Sutton with the influence that the co-conspirators had inside the DOE. The Vantage document particularly served this purpose as a "show document" to stimulate the flow of money from Sutton on down through those in the conspiracy. Sucher also was the illegal source of DOE documents relevant to the investigation of Sutton and his BPM companies.

■ Moreover, we cannot ignore the general policy favoring joint trials of defendants indicted together, *see United States v. Hines,* 455 F.2d 1317, 1334 (D.C. Cir.1971), especially when, as here, the respective charges require presentation of much of the same evidence, testimony of the same witnesses, and involve two defendants who are charged, *inter alia,* with participating in the same illegal acts. The trial court committed no error in denying Sucher's motion for severance.

### B. *Speedy Trial Act*

Sucher was arraigned with Maxwell and Gazzara on October 15, 1984. A trial was scheduled for November 30, 1984, but on November 29, 1984 (as a result of Maxwell's cooperation and guilty plea on November 13, 1984) the government obtained additional evidence and on November 29, 1984 returned a superseding indictment that included Sutton as co-defendant. Trial commenced on January 24, 1985. Sucher argues that he was denied the right to a trial within seventy days, as required by the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*

■ However, Sucher misreads the Act, which requires trial to commence within 70 days of arraignment, but excuses

> [a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.

*Id.* § 3161(h)(7). The Senate Report on the Speedy Trial Act states that the quoted provision

> provides for the exclusion of time from the time limits where the defendant is joined for trial with a codefendant who was arrested *or indicted* after the defendant. The purpose of the provision is to make sure that [§ 3161(h)(7)] does not

alter the present rules on severance of codefendants by forcing the Government to prosecute the first defendant separately or be subject to a speedy trial dismissal motion....

S.Rep. No. 83–1021, 93d Cong., 2d Sess. 38 (1974) (emphasis added). The trial date was 101 days after Sucher's initial arraignment, but only 55 days after the second arraignment, which was a "reasonable period of delay" in order to allow the newly indicted Sutton adequate time to prepare for trial. The trial of Sucher was conducted fully within the text and intent of the relevant statute.

### C. *Right to Counsel*

Sucher objects to the taping of his conversations with Kolbert and Peacock after the government became aware on October 25, 1983 that Sucher was represented by counsel. Sucher bases his argument on the Sixth Amendment right to counsel and the Canons of Legal Ethics, contending that the government should have notified his attorney. The trial court denied Sucher's motion to suppress the resulting tapes that were subsequently admitted into evidence at trial.

■ The Sixth Amendment [14] is not applicable here. It provides that an *"accused"* is entitled "to have the Assistance of Counsel for his *defence*" (emphasis added). Sucher was not an "accused" when the taping occurred. The right to counsel attaches only after the initiation of "adversary judicial criminal proceedings," *e.g.,* formal charge, preliminary hearing, indictment, information, or arraignment. *See United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984); *United States v. Lemonakis,* 485 F.2d 941, 953–54 (1973), *cert. denied,* 415

---

**14.** The Sixth Amendment provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been pre-viously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the Witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974). The taping here occurred at the investigatory stage *before* the initiation of any judicial proceedings which would call for Sucher's defense.

Likewise, Sucher's objection based on Disciplinary Rule 7–104 of the Code of Professional Responsibility was explicitly rejected in *Lemonakis*, 485 F.2d at 956. Rule 7–104 was never meant to apply to situations such as this one, but was meant to ensure that lawyers not prey on persons known to be represented by counsel. *Id.* In short, neither the Sixth Amendment nor the Canons of Legal Ethics provide a basis for excluding the taped conversations.

### D. *Federal Rule of Evidence 106*

Sucher's final issue involves his unsuccessful attempt, prior to his cross-examination of Peacock, to introduce *portions* of transcript from the taped conversations between Sucher and Peacock. Specifically, Sucher sought to introduce approximately four pages of transcript from the conversation of October 28, 1983 at 2:00 p.m. (J.A. 132–35). Those four pages are set out in full in the margin.[15]

The government had introduced, as part of its direct examination of Peacock, portions of the conversations of October 25, 1983, October 26, 1983, and the conversation that began at 3:20 p.m. on October 28,

**15.** Sucher sought to introduce the following four transcript pages of the conversation taped by Peacock on October 28, 1983 at 2:00 p.m. The portions specifically excluded by the trial court are underscored:

Sucher: *I don't know, to be honest with you, what Shelley had going with (inaudible) Maxwell that uh, I just kind of guessed because I don't know if Shelley made representations to Maxwell about uh, I guess* I shouldn't talk about this because if they ask you what you're [sic] supposition on it you don't want to know anything or ... have any ideas.

Peacock: (Laughing).

Sucher: ... true? True.

Peacock: True.

Sucher: Leave it. *But I don't know what ideas Shelley might have put in his head.*

Peacock: *Meaning whose head?*

Sucher: *Maxwell's.*

Peacock: Maxwell's?

Sucher: Yeah. Because regardless of the reality of the situation what Maxwell thought happened that uh, you know, that isn't it.

Peacock: They can think anything they want, it's proving it.

Sucher: Yeah ...

Peacock: That will get, that will get you in trouble.

Sucher: ... if they can get Maxwell to testify to the best of his recollection that XY was promised to him and whether or not that's true, it's his word versus my word!

Peacock: Yeah, not an altogether inviting proposition.

Sucher: It's not a bad proposition, *but I've always had a history of cooperating with people ...*

Peacock: Yeah.

Sucher: ... who, uh, ask questions about other people, so that's not bad.

Peacock: Oh.

Sucher: *I certainly never took any money from Shelley. (Pause) Anyway, so that's uh ...*

Peacock: Have you gone to church (laughing). I have ...

Sucher: No, but I need to. Uhm ...

Peacock: I wonder if they still give sanctuary.

Sucher: Who knows, who knows, so to make a long story longer, uhm, actually I was wondering if they talked to Maxwell. If they talked to Maxwell (inaudible).

Peacock: Okay, I am operating under the assumption that they have ...

Sucher: Okay.

Peacock: Alright? Now, I know what I did ...

Sucher: I don't want to know.

Peacock: ... with Shelley, okay?

Sucher: Yeah.

Peacock: Uhm ...

Sucher: I don't want to know, period.

Peacock: Okay, but I, I do know what I did and I'll be real blunt with you—I could be in trouble and I think I am, alright.

Sucher: *Okay. (Pause) Well, I don't know if I'm in trouble or not, it depends on what thoughts Shelley put into Maxwell's head.* I know what I thought when I was doing it that it wouldn't get me in trouble, but ...

Peacock: Did you do anything with Shelley in the Sutton case beside [sic] talk to Maxwell?

Sucher: Uhm ... do I have to answer that question ...

Peacock: (Laughing) Yes, raise your right hand.

Sucher: I really don't want to answer that question only because (inaudible).

Peacock: Okay, let, let me, let me put it this way ... they are talking to me about it.

Sucher: Yeah.

Peacock: Okay.

(J.A. 132–35).

1983 (there were three taped conversations between Sucher and Peacock on October 28, 1983, one in the morning, one at 2:00 p.m., and one at 3:20 p.m.). The portions of the conversations introduced by the government gave the impression that Sucher was afraid of Maxwell and Kolbert because Sucher thought they would reveal his role in the conspiracy. In short, the government's evidence tended to show Sucher's consciousness of guilt.

The government objected to Sucher's attempt to introduce portions of the 2:00 p.m. conversation on October 28, 1983, arguing that these pages constituted excludable out-of-court exculpatory statements concerning Sucher's state of mind at the time of the alleged crime. *See* Federal Rules of Evidence 801, 802. The court sustained the government's objection, finding the statements excludable as "exculpatory extra-judicial statements as to a past fact" (Tr. 906, 912–14). Sucher based his request for admission in part on the rule of completeness contained in Federal Rule of Evidence 106, *infra,* which generally permits the contemporaneous admission of portions of writings or recorded statements when the already introduced portions might be misleading unless properly placed in context.

 Sucher contends that he requested the admission of the entirety of at least three separate recorded conversations with Peacock. This argument, however, was not properly preserved for appellate review. It is true that the initial request was for admission of all conversations recorded by Peacock, but Sucher's attorney sought to assuage the court's fears by saying, "I am going to focus Mr. Peacock on a couple of discrete areas." (Tr. 849). The court denied this broad request, telling Sucher's attorney, "I would like very much to see discrete portions of the manuscripts rather than entire telephone conversations which you think are particularly significant for purposes of an explanatory context for the phone conversations that the government did introduce ..." (Tr. 899). Sucher's attorney replied, "The Court is correct. I understand what the Court's reservation is

and its seems like the ball is in my court." (Tr. 900). A moment later, the court instructed Sucher's attorney to "[h]one in on particular portions of the transcript," and Sucher's attorney again indicated his consent (Tr. 902). Sucher's attorney affirmed for a third time the limited nature of his specific request for admission of portions of the tapings (Tr. 909). Against this backdrop it is clear that Sucher waived whatever objections he may have had to the court's prohibition on introducing the entirety of the other taped conversations.

 Sucher attempts, in addition, to challenge the correctness of the court's ruling that the statements from the 2:00 p.m. October 28 conversation were excludable hearsay as assertions of past fact offered to prove the truth of the matter asserted therein. Here, too, it is clear that Sucher waived his right to raise the issue on appeal. In response to the court's statement that a particular statement was an assertion of past fact, Sucher's attorney said, "I agree with that. Therefore, although the Court wants for me to maybe suggest an 803 argument, I really don't think that is what this is all about." (Tr. 909). At any rate, as shown by the underscored portions of the conversation, the court was quite correct in characterizing the statements as excludable assertions of past fact and exculpatory hearsay statements.

This is not, however, the end of our inquiry. In the government's direct examination of Peacock, other recorded conversations had been used in part to support the government's case. One of the key issues at trial was whether Sucher had the requisite *mens rea* when he passed the documents to Kolbert. Sucher's defense was significantly based on an alternative construction of his role in passing the documents: namely, that Sucher innocently passed the documents to Kolbert because Kolbert was superior to Sucher in the hierarchy at DOE. Sucher's argument conceded that he may have violated certain ethical obligations in talking with Maxwell and Peacock about the Sutton case, but,

without taking the stand, he denied taking money in exchange for giving the documents to Kolbert, and denied knowing that Kolbert was acting illegally. Sucher's attorney therefore had quite a different interpretation of some portions of his conversations with Sucher and Peacock. Sucher contended that these conversations did not show the necessary criminal intent, but rather demonstrated a fear of the falsehoods that Maxwell and Kolbert might tell the government. Sucher argued that his fear of Kolbert was rational considering the character of Kolbert and the variety of shady activities Kolbert had been engaged in. Since Sucher admitted providing Kolbert with documents, but denied receiving money or having any illegal intent, such an interpretation is not entirely implausible, and such an inference would have contradicted the government's inference that the conversations supported its case.

Such circumstances raise the question whether Rule 106 permits the introduction of evidence that is otherwise *inadmissible* under the Federal Rules of Evidence. Rule 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The Advisory Committee note to Rule 106 states that "[t]he rule is based on two considerations. The first is to correct a misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial."

Rule 106 explicity changes the normal order of proof in requiring that such evidence must be "considered contemporaneously" with the evidence already admitted. Whether Rule 106 concerns the substance of evidence, however, is a more difficult matter. The structure of the Federal Rules of Evidence indicates that Rule 106 is concerned with more than merely the order of proof. Rule 106 is found not in Rule 611, which governs the "Mode and Order of Interrogation and Presentation," but in Article I, which contains rules that generally restrict the manner of applying the exclusionary rules. *See* C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5078, at 376 (1977 & 1986 Supp.). Moreover, every major rule of exclusion in the Federal Rules of Evidence contains the proviso, "except as otherwise provided by these rules," [16] which indicates "that the draftsmen knew of the need to provide for relationships between rules and were familiar with a technique for doing this." *Id.* There is no such proviso in Rule 106, which indicates that Rule 106 should not be so restrictively construed. *See id.* [17]

Rule 106 can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously. A contrary construction raises the specter of distorted and misleading trials, and creates difficulties for both litigants and the trial court.

---

**16.** *See, e.g.,* Federal Rules of Evidence 402 (irrelevant evidence), 501 (privileges), 602 (lack of personal knowledge), 613(b) (examining witness concerning prior statement), 704 (opinion on ultimate issue), 802 (hearsay), 806 (credibility of declarant), 901(b)(10) (methods of authentication), 1002 (original writing). *See* C. Wright & K. Graham, *supra,* at 376.

**17.** Professors Wright and Graham suggest additional reasons why Rule 106 should not be limited solely to otherwise admissible evidence. First, they note that the only limitation on the common-law doctrine of completeness embod-ied in Rule 106 was on grounds of prejudice. C. Wright & K. Graham, *supra,* at 373–74. Second, the Advisory Committee modeled Rule 106 on the California codification of the completeness doctrine and the federal civil rule governing partial use of depositions, both of which were not restricted by other rules of evidence. *Id.* at 374–75. Third, the Justice Department specifically requested the Senate Judiciary Committee to add a proviso stating that Rule 106 is limited to evidence that was "otherwise admissible." No proviso was added. *Id.* at 375.

The most sensible course is to allow the prosecution to introduce the inculpatory statements.[18] The defense can then argue to the court that the statements are misleading because of a lack of context, after which the court can, in its discretion, permit such limited portions to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence. Such a result is more efficient and comprehensible, and is consonant with the requirement that the "rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Federal Rule of Evidence 102.[19]

■ Moreover, under this approach the trial court can focus solely on issues of distortion and timing as mandated by Rule 106. The trial court has a wide range of discretion to expeditiously structure the inquiry, as the judge did in this case by requiring Sucher's attorney to point to specific passages of the transcript that ought to have been admitted to avert the distorting effect of the portions already introduced by the government. In addition, the provision of Rule 106 grounding admission on "fairness" reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context. *See United States v. McCorkle*, 511 F.2d 482, 486–87 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975) (applying the doctrine of "verbal completeness" prior to the passage of the Federal Rules of Evidence); VII J. Wigmore, Evidence § 2113

(3d ed. 1940). The response of Sucher's attorney typically indicates the limited scope of the Rule 106 admission because he pointed to only four pages of transcript, from which Judge Jackson excluded four parts. In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose.

We turn, therefore, to the specific portions of the transcript that Sucher requested under Rule 106. They are numbered below:

(1) (J.A. 133).

Sucher: I don't know, to be honest with you, what Shelley had going with (inaudible) Maxwell that uh, I just kind of guessed because I don't know if Shelley made representations to Maxwell about Uh, I guess....

. . . . .

Sucher: ... But I don't know what ideas Shelley might have put in his head.

Peacock: Meaning whose head?

Sucher: Maxwell's

(2) (J.A. 134).

Sucher: ... but I've always had a history of cooperating with people....

(3) (J.A. 134).

Sucher: I certainly never took any money from Shelley....

(4) (J.A. 135).

Sucher: Okay. (PAUSE) Well, I don't know if I'm in trouble or not, it depends on what thoughts Shelley put into Maxwell's head. I know what I thought when I was doing it wouldn't get me in trouble, but....

---

**18.** Professors Wright and Graham assert:
> No self-respecting judge would permit a party to manipulate the rules of evidence to put on a case that looked like an advertisement for a bad movie—bits and pieces taken out of critical context to create a misleading impression of what was really said. If this cannot be done in a forthright manner under Rule 106, the judge must find some other way to see that justice is done.... In short, there will be few cases in which the judge cannot reach the result that sound policy compels; to say that he cannot do this under Rule 106 is to prefer the costly, roundabout, fictional method over the direct and honest approach.

C. Wright & K. Graham, *supra*, at 377.

**19.** The example of a criminal case is illustrative. Similar benefits will accrue from a similar interpretation of Rule 106 in civil cases.

The portions of Sucher's conversation introduced by the government seem to say that he "never took any money *from Shelley*" but that he was afraid of what Maxwell might say, that he feared conviction, and that he did not wish to reveal *to Peacock* whether he had been the source of documents passed to Kolbert.

However, as mentioned earlier, Sucher's defense was that he innocently gave Kolbert the documents without any knowledge of illegality. Three of the four excluded statements would support an inference consistent with that defense. The second statement (2) could have supported Sucher's assertion that he provided documents to Kolbert out of a desire to cooperate with his fellow employee at DOE. The first (1) and fourth (4) statements would have supported an inference contrary to the government's contention that Sucher exhibited consciousness of his guilt. The possible contrary inference of (1) and (4) is that Sucher gave documents innocently, and was afraid that Kolbert may have falsely told Maxwell that Sucher, as the source of the documents, was a knowing and willing participant in the illegal conspiracy.

The excluded statements would have partially rebutted the government's use of the recordings, and were relevant to Sucher's defense. Since this was a criminal case Sucher had a constitutional right not to testify, and it was thus necessary for Sucher to rebut the government's inference with the excluded portions of these recordings. *See United States v. Walker*, 652 F.2d 708, 713 (7th Cir.1981). Under our analysis of Federal Rule of Evidence 106, Sucher should have been permitted to introduce these four portions of the recorded conversation with Peacock if considerations of "fairness" justified contemporaneous admission and consideration.

Even when the trial court errs, however, reversal is not required unless "substantial rights" are affected. Fed.R.Crim.P. Rule 52(a). Accordingly, we must uphold the jury verdict unless we determine that the error substantially prejudiced the right of

the defendant to a fair trial. As stated definitively by Justice Rutledge:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States*, 328 U.S. 750, 756, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946).

As is readily apparent from the evidence presented at trial and recited above, there can be no doubt as to the soundness of the jury verdict. To summarize briefly: The jury heard extensive, uncontradicted and unequivocal testimony from Kolbert as to Sucher's complicity in passing DOE documents and information in exchange for $5,000. The two of them together came up with the idea of a "show document" to bait the trap, and the record is devoid of any evidence to support a *valid* reason for passing the documents to Kolbert. The jury heard Sucher's supervisor at DOE testify that Sucher would have had access to the specific documents that were passed on to Maxwell and Sutton and which were presented as documentary evidence at trial. Sucher's telephone call to Peters to tell him to expect a call from Sutton was highly incriminating, and the jury could infer therefrom that Sucher was at the center of the conspiracy—where Kolbert's testimony placed him. Thomas Peacock testified as to Sucher's continuing role in passing information out of DOE *and* referring Sutton to Alex Peters. Peacock was unaware of Sucher's role as the source of the documents initially, because Kolbert wanted to conceal his taking the "lion's share" of the bribe money from Sutton. The jury heard Maxwell's testimony that

he spoke *directly* with Sucher during the time of Sutton's criminal trial in Oklahoma.

Finally, the jury heard recordings of Sucher's taped conversations with Peacock and Kolbert. While Sucher's conversations with Peacock may have been somewhat detrimental to his defense, they were nevertheless rather limited. The same cannot be said of Sucher's conversation in November 1983 with Shelley Kolbert. The jury heard Sucher tell Kolbert that "they [the government] know that I gave you the documents.... I gave them to you and you gave them back to me...." (J.A. 178–79). Sucher confirmed in so many words that he had *taken money from Kolbert* for the documents, but that the government could *"try and look[ ] for money in me all day, [but] they won't find it.... I have a terrific talent."* (J.A. 181–82) (emphasis added).

Notwithstanding the contention that ambiguous inferences could conceivably be drawn from those four parts of Sucher's conversation with Peacock, which were not admitted, the recorded conversations with Kolbert evince beyond a reasonable doubt that Sucher's statements in effect constituted a complete admission of his guilt in the Sutton conspiracy. His *"money"* and *"talent"* statement clearly imply that he took money for his part (furnishing the documents) in the charged offenses but that his "talent" for concealment would prevent the government from finding it. This personal statement to Kolbert, a fellow employee who was Sucher's confederate in the illegal passing of the documents for which Sucher admits taking money and having a "talent" for concealing it—because Sucher could not deny as much to Kolbert, the person who had paid him the money—completely overrides the possibility of any favorable probative value being given to Sucher's denial to Peacock (who was not an employee of the agency) that he did not take "money." No reasonable jury would have believed that Sucher did not take money when he in effect admitted to Kolbert that he did. We thus conclude that the refusal to admit the four segments of the 2:00 p.m. taped conversation, which in the court's discretion could have been admitted, did not substantially influence Sucher's defense or the verdict, and, at the most, is harmless error.

We have no hesitation in affirming the jury's verdict.

### IV. CONCLUSION

Robert Sutton and Mark Sucher were both willing participants in a conspiracy to bribe government officials in order to avoid the legal consequences of Sutton's illegal business practices. In a lengthy and difficult trial, a jury found both men guilty as charged. Considered in light of the overwhelming evidence of the defendants' guilt we find no basis for disturbing the jury verdict. The convictions are therefore affirmed.

*Judgment accordingly.*