UNITED STATES, Appellee,

v.

Vanessa de la CRUZ–PAULINO, Defendant, Appellant,

UNITED STATES, Appellee,

v.

Wanda DÍAZ–PÉREZ, Defendant, Appellant.

Nos. 94–1985, 94–1986.

United States Court of Appeals, First Circuit.

Heard May 5, 1995.

Decided Aug. 3, 1995.

Rachel Brill, Old San Juan, PR, with whom Jose Fernando Irizarry, Rio Piedras, PR, was on brief, for appellant Diaz–Perez.

Enrique Velez–Rodriguez, Santurce, PR, for appellant de la Cruz Paulino.

Jose A. Quiles–Espinosa, Sr. Litigation Counsel, Hato Rey, PR, with whom Guillermo Gil, U.S. Atty., Washington, DC, and Antonio R. Bazan, Asst. U.S. Atty., Hato Rey, PR, were on brief, for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Defendants-appellants Wanda Díaz–Pérez and Vanessa de la Cruz–Paulino (collectively, "defendants") appeal their convictions for aiding and abetting each other and others in the unlawful possession of, with intent to distribute, approximately eighty kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Díaz–Pérez also appeals her conviction for using a communications facility on six separate occasions to facilitate the distribution of cocaine, in violation of 21 U.S.C. § 843(b). Díaz–Pérez argues that she is entitled to a new trial because the government violated Fed.R.Crim.P. 12(d)(2) by failing to designate certain of the evidence it intended to use during its case in chief; because the district court admitted hearsay tape recordings into evidence; and because the trial judge made prejudicial comments in front of the jury. Both Díaz–Pérez and de la Cruz–Paulino argue that the district court abused its discretion in allowing a representative sample of cocaine to be sent into the

jury deliberation room. Finally, de la Cruz–Paulino argues that the evidence was insufficient to establish her guilt beyond a reasonable doubt. We affirm Díaz–Pérez's conviction, but reverse de la Cruz–Paulino's conviction for insufficient evidence.

## I.

### Background

On January 21, 1994, Federal Drug Enforcement Administration ("DEA") agents in Puerto Rico met with a cooperating individual known as "Chita," who spoke with them about a pending drug transaction involving 200 kilograms of cocaine. Chita told the agents that the Puerto Rican contact was known as "Negro." He did not refer to either defendant.

Between 12:00 noon and 4:20 p.m., DEA agents recorded four telephone conversations placed by Chita to a Colombian contact known as "Jota." During the trial, the district court admitted tapes of these recorded conversations into evidence without objection from defense counsel. In one of the conversations, Jota told Chita that he would make arrangements for the Puerto Rican contact, whom he referred to as a female schoolteacher, to telephone Chita at the number Chita provided, which in reality was the number for a DEA cellular telephone. It was established at trial that Díaz–Pérez was a teacher.

Not long after these telephone calls ended, the DEA decided to abort the operation, and Agents Andaluz and Salazar transported Chita to the airport. While en route to the airport, however, the agents received a call from Díaz–Pérez on the DEA telephone. The ensuing conversation was not recorded. However, at trial, Díaz–Pérez testified that during that unrecorded conversation, she was told that the wrapped packages she was transporting contained coffee for which excise taxes had not been paid and was instructed not to mention any names during subsequent conversations. Andaluz testified that he was the one who had spoken with Díaz–Pérez during the unrecorded conversation and that he never mentioned the word "coffee."

After dropping Chita off at the airport, Andaluz and Salazar returned to DEA headquarters and conferred with other agents regarding the contents of the call. They then decided to contact Díaz–Pérez and arrange for a transfer of the cocaine. To accomplish this, Andaluz placed five telephone calls to Díaz–Pérez between 7:10 p.m. and 9:55 p.m. and received one telephone call from Díaz–Pérez. The DEA recorded all of these conversations, and the district court admitted the recordings into evidence, Díaz–Pérez stipulating that the voice in the recordings belonged to her. None of the conversants explicitly referred to cocaine or coffee in the recorded conversations, although Andaluz did use the word "kilos" once.

During the six recorded conversations, Andaluz and Díaz–Pérez discussed the details of the delivery, including the mode of transportation and the size of the shipment. After a brief exchange in which Díaz–Pérez attempted to solicit Andaluz's help in carrying the bags containing the cocaine down from a second-story apartment, Andaluz asked, "Can't you give somebody there $30, $40 I'll pay you back over here, to place it in the trunk, only to place it in the trunk, don't bring him over or anything, to come over here?" Díaz–Pérez indicated that she would, and eventually Andaluz and Díaz–Pérez agreed to meet in the parking lot of a Burger King restaurant.

At trial, Andaluz testified that after Díaz–Pérez and de la Cruz–Paulino arrived at the Burger King parking lot, but before he and Salazar approached them, he activated a concealed microcassette recorder. The district court admitted the recording of the subsequent conversation into evidence without objection. After greeting defendants, Salazar asked, "Did you get it down," and de la Cruz–Paulino answered, "Of course we did." A short discussion about the $40 followed, after which Andaluz asked Díaz–Pérez, "Which is your car?" Díaz–Pérez stated, "That black one there, in the trunk, two bales and ... eight doubles...." Andaluz and Salazar opened the trunk and one of the garbage bags, Andaluz stating that he had "[t]o check it out girl, because what will I do with [unintelligible]." Díaz–Pérez then ex-

claimed, "Shut up! Oh, God, the two bales and the other stuff." Andaluz then said, "No, relax, we are getting involved here to get a party." De la Cruz–Paulino then said, "No, watch out the police is around, going around here." Defendants were arrested immediately thereafter.

DEA agents searched Díaz–Pérez's car at the time of defendants' arrest. The trunk contained approximately eighty kilograms of cocaine with a stipulated value of $1.2 million. The cocaine was wrapped and sealed in such a way that it was impossible to see the contents.[1] Also seized were a cellular telephone, a package of coffee, and a piece of cardboard. Chita's name was written on the cardboard, along with the DEA telephone number, several figures that totaled eighty, and the words "coffee" and "large garbage bags." DEA agents did not find any weapons, nor did they test defendants' clothing for the presence of cocaine.

Defendants were subsequently indicted for aiding and abetting each other and others in possession of, with intent to distribute, a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Díaz–Pérez was also indicted on six counts of using a communications facility in furtherance of a narcotics transaction, in violation of 21 U.S.C. § 843(b).

Prior to trial, defendants requested, pursuant to Fed.R.Crim.P. 12(d)(2), that the government designate the evidence it intended to introduce at trial. In response, the government designated the seized cocaine, the materials in which the cocaine had been wrapped, and various tape recordings and photographs. In addition, the government stated, "Any other physical and/or documentary evidence will be notified at least five (5) days before the date of trial." The government never notified defendants that it intended to introduce the telephone or the cardboard seized from Díaz–Pérez's car into evidence. Nonetheless, the government referred to both pieces of evidence during its opening statement at defendants' jury trial.

Immediately following the opening statement of Díaz–Pérez, both defense counsel moved to exclude the telephone and the cardboard because they had not been designated as evidence by the government as required under Rule 12(d)(2). During the discussion on defendants' motion, the government never admitted that it had not designated either piece of evidence, but instead repeatedly insisted that it had provided defendants with full discovery, stating, for example,

> they were fully aware that this was a piece of evidence and this is not [a] surprise to them they had it from about three weeks after the defendants had been arrested this is no surprise to them, they should be aware that this was a piece of evidence and the government could attempt to use such evidence.

The district court denied the motion, stating, "it's been provided." When defense counsel objected that the evidence, although provided under Fed.R.Crim.P. 16, had not been designated as required by Rule 12(d)(2), the district court stated, "It is not [a] surprise, it[']s there and you have it." The evidence was subsequently admitted without further objection.

At the close of the government's case in chief, both defendants moved pursuant to Fed.R.Crim.P. 29 for judgments of acquittal; the district court denied both motions. Díaz–Pérez then testified in her own defense, but offered no other evidence. De la Cruz–Paulino did not testify and offered no evidence. At the close of trial, both defendants renewed their Rule 29 motions, and each defendant also objected to the district court's decision to allow a representative sample of unpackaged cocaine, which had been admitted into evidence without objection, into the jury room. Defendants now appeal their convictions.

## II.

### Discussion

*A. Rule 12(d)(2) Violation*

■ Díaz–Pérez argues that the district court abused its discretion in admitting into

---

1. Each kilogram was wrapped individually in a tan-colored wrapping, then two kilograms were bundled together and wrapped in a black wrapping. The bundles were then placed into three large garbage bags.

evidence the cellular telephone and the piece of cardboard because the government did not disclose its intent to use the evidence during its case in chief as required by Fed. R.Crim.P. 12(d)(2).[2] Díaz–Pérez first argues that the district court erred in holding that the government did not violate Rule 12(d)(2) since it had provided defendants with open-file discovery. We agree. "To the extent that the government's open files contain information that is subject to Rule 16 discovery, Rule 12(d)(2) creates a notice requirement. The open file policy does not, in and of itself, satisfy this notice requirement because it does not specify which evidence the government intends to use at trial." *United States v. Brock,* 863 F.Supp. 851, 868 (E.D.Wis.1994). Providing open-file discovery does not satisfy Rule 12(d)(2) because "the defendant is still 'left in the dark' as to exactly what evidence, discoverable under Rule 16, the government intends to rely upon in its case in chief at trial." *United States v. Kelley,* 120 F.R.D. 103, 107 (E.D.Wis.1988). Thus the district court erred in ruling that the government's open-file discovery satisfied the requirement of Rule 12(d)(2). The government's failure to designate either the telephone or the cardboard as evidence was a violation of the rule.

■ Díaz–Pérez next argues that to remedy the government's Rule 12(d)(2) violation, we should reverse her conviction and remand for a new trial as we did for the victim of a Rule 16 violation in *United States v. Alvarez,* 987 F.2d 77, 85–86 (1st Cir.), *cert. denied,* ——

U.S. ——, 114 S.Ct. 147, 126 L.Ed.2d 109 (1993). We do not agree.[3]

■ We have not yet addressed the effect of a violation of Rule 12(d)(2). In reviewing discovery violations, however, we have made clear that "[a] defendant must prove that the alleged violation prejudiced his case to succeed in obtaining a reversal on appeal." *United States v. Nickens,* 955 F.2d 112, 126 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992); *see also United States v. Valencia,* 656 F.2d 412, 416 (9th Cir.), *cert. denied,* 454 U.S. 877, 903, 102 S.Ct. 356, 411, 70 L.Ed.2d 186, 222 (1981). We extend this prejudice requirement to violations of Rule 12(d)(2).

Díaz–Pérez argues that the government's Rule 12(d)(2) violation prejudiced her in three ways: (1) she was not prepared to file a motion to suppress the evidence, (2) the evidence forced her to alter her trial strategy, and (3) the evidence had an effect on her plea strategy. None of these reasons warrants reversal in this case.

■ Rule 12(d) is "a matter of procedure," Fed.R.Crim.P. 12 advisory committee's note (internal quotation omitted), rather than a rule designed to ensure fairness at trial. As its text makes clear, Rule 12(d)(2) allows defendants to request notice of the government's intent to use evidence "*in order to afford an opportunity to move to suppress evidence* under subdivision (b)(3) of this rule." Fed.R.Crim.P. 12(d)(2) (emphasis added).[4] Rule 12(d) "provides a mechanism

---

**2.** Fed.R.Crim.P. 12(d)(2) provides:

> **(d) Notice by the Government of the Intention to Use Evidence.**
>
> . . . .
>
> **(2) At the Request of the Defendant.** At the arraignment or as soon thereafter as is practicable the defendant may, in order to afford an opportunity to move to suppress evidence under subdivision (b)(3) of this rule, request notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16 subject to any relevant limitations prescribed in Rule 16.

**3.** We would review a district court's decision to impose a particular sanction only for abuse of discretion. *United States v. Valencia,* 656 F.2d 412, 415 (9th Cir.) (reviewing sanctions imposed

for Rule 12(d)(2) violation for abuse of discretion), *cert. denied,* 454 U.S. 877, 903, 102 S.Ct. 356, 411, 70 L.Ed.2d 186, 222 (1981); *see also Alvarez,* 987 F.2d at 85 (reviewing district court's treatment of government's failure to provide pretrial discovery for abuse of discretion). In this case, however, the district court did not consider imposing a sanction since it did not find that a violation occurred. Accordingly, we must ourselves determine whether a sanction was necessary.

**4.** Fed.R.Crim.P. 12(b) provides:

> **(b) Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

for insuring that a defendant knows of the government's intention to use evidence to which the defendant may want to object" so that the defendant may "avoid the necessity of moving to suppress evidence which the government does not intend to use." Fed. R.Crim.P. 12 advisory committee's note; *see also* 1 Charles A. Wright, *Federal Practice and Procedure: Criminal* § 197, at 735 (2d ed.1982) (Rule 12(d) "is intended to facilitate the making of a pretrial motion for suppression of evidence."). Thus, Rule 12(d) aids defendants in complying with their Rule 12(b)(3) obligation to make motions to suppress evidence prior to trial. This in turn preserves the integrity of a trial by not interrupting it with suppression motions. *See* Fed.R.Crim.P. 12 advisory committee's note (Rule 12(b)(3) " 'is designed to eliminate from the trial disputes over police conduct not immediately relevant to the question of guilt' ") (quoting *Jones v. United States*, 362 U.S. 257, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697 (1960) (emphasis eliminated)).[5]

As "a matter of procedure," Rule 12(d) differs from discovery rules designed to ensure fairness. *See* Fed.R.Crim.P. 12(d) advisory committee's note; *cf.* Fed.R.Crim.P. 12.1 (Notice of Alibi) advisory committee's note ("[t]he major purpose of a notice-of-alibi rule is to prevent unfair surprise"); Fed. R.Crim.P. 16 (Discovery and Inspection) advisory committee's note ("broad discovery contributes to the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by minimizing the undesirable effect of surprise at the trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence"). Rule 12(d) was not designed to aid the defendant in ascertaining the government's trial strategy, but only in effective-ly bringing suppression motions before trial, as required by Rule 12(b)(3).

■ We first consider Díaz–Pérez's argument that she was prejudiced because, not expecting the government to introduce the telephone or the cardboard, she was unprepared to file a motion to suppress either of them. On appeal, Díaz–Pérez does not articulate any basis for suppression of the evidence; we note that Díaz–Pérez did not seek to suppress other evidence seized from her car, nor does there appear to us to be a basis for suppressing the evidence. Absent some discussion regarding suppression, we will not view the lack of opportunity for a suppression hearing as prejudicial. Merely stating that "the decision to file a motion to suppress ... could have been significantly affected by the knowledge prior to trial[ ] that the government intended to present those items in evidence" is not enough.

■ Díaz–Pérez also argues that the admission of the telephone and the cardboard greatly affected her trial strategy and her incentives to plead guilty since the government's case became markedly stronger with that evidence. Rule 12(d) was not, however, designed to alert defendants to the strength or weakness of the government's case against them; rather, it was designed to aid defendants in fulfilling their Rule 12(b)(3) obligation to make suppression motions prior to trial. Since trial strategy and plea strategy are simply not implicated by Rule 12(d), the alleged effect of a Rule 12(d) violation upon trial strategy or plea strategy cannot satisfy the prejudice requirements for reversal on appeal.

■ We recognize, however, that even though Rule 12(d) was not designed to give defendants notice of the government's trial strategy, the government's failure to designate certain pieces of evidence could work an

----

.... 
(3) Motions to suppress evidence 
....

**5.** We think that government violations of Rule 12(d)(2) should excuse a defendant's failure to move to suppress evidence prior to trial, as required by Rule 12(b)(3), since defendants have no incentive to move to suppress evidence that the government will not be introducing. *See United States v. Poole*, 794 F.2d 462, 464 n. 1 (9th Cir.1986) (excusing the defendant's failure to move to suppress evidence prior to trial since the government had not warned the defendant that the evidence would be used); Fed.R.Crim.P. 12(f) ("Failure by a party to raise defenses or objections or to make requests which must be made prior to trial ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.").

unfairness if the defendant were not prepared immediately to rebut it. In such cases, we think that a district court would not abuse its discretion by granting the defendant a continuance, rather than allowing the government effectively to sandbag the defendant by introducing previously undesignated evidence. Whether or not a defendant should be granted a continuance for fairness reasons, however, is a matter best left to the discretion of the district court. On appeal, we will only consider prejudice stemming from the function of Rule 12(d), namely matters regarding potential motions to suppress.

 Thus, although the government violated Rule 12(d)(2) by not indicating prior to trial its intention to introduce the telephone and the cardboard into evidence during its case in chief, reversal is not mandated because Díaz–Pérez suffered no prejudice. That having been said, we pause to make clear that we do not condone governmental violations of this sort. Like the Advisory Committee, however, we believe that in general, "attorneys for the government will in fact comply [with Rule 12(d)(2) ]." Fed. R.Crim.P. 12 advisory committee's note.[6] We rely on district courts to impose appropriate sanctions for governmental noncompliance and encourage them to grant continuances and hold additional suppression hearings where warranted. Cf. Valencia, 656 F.2d at 416 (finding no error in admission of undesignated evidence where the district court conducted a second suppression hearing to determine admissibility of undesignated evidence). Where governmental noncompliance is the result of bad faith, exclusion of the undesignated evidence may be

appropriate. Cf. United States v. Flores–Rivera, 56 F.3d 319, 328 n. 7 (1st Cir.1995) (repeating admonishment against government misconduct and stating that court may use supervisory power to dismiss an indictment to deter future prosecutorial misconduct).

### B. Tape Recordings

Díaz–Pérez next argues that the district court committed reversible error by admitting into evidence three tape recordings of conversations between Chita and two unnamed and uncharged Colombian contacts. Díaz–Pérez believes that the contents of the tape recordings constitute hearsay subject to no exception. Díaz–Pérez argues that the tapes could not have been (implicitly) admitted pursuant to Fed.R.Evid. 801(d)(2)(E)[7] since the district court made no factual finding that the persons on the tapes were participating in a conspiracy with Díaz–Pérez and speaking in furtherance of that conspiracy as required by United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir.1977). In addition, Díaz–Pérez contends that had an inquiry been conducted, the court could not have found that "the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." Id. at 23.

 Because Díaz–Pérez failed to object in the district court, the issue has not been preserved for appeal. As we explained in United States v. Figueroa, 818 F.2d 1020, 1026 (1st Cir.1987) (alteration in Figueroa ):

> (Approved Draft, 1971) at p. 116: "A failure to comply with the duty of giving notice could lead to the suppression of evidence. Nevertheless, the standards make it explicit that the rule is intended to be a matter of procedure which need not under appropriate circumstances automatically dictate that evidence otherwise admissible be suppressed."
> Fed.R.Crim.P. 12 advisory committee's note.

---

**6.** The Advisory Committee's notes discuss why no sanctions were provided for violations of Rule 12(d)(2):

> No sanction is provided for the government's failure to comply with the court's order because the committee believes that attorneys for the government will in fact comply and that judges have ways of insuring compliance. An automatic exclusion of such evidence, particularly where the failure to give notice was not deliberate, seems to create too heavy a burden upon the exclusionary rule of evidence, especially when defendant has opportunity for broad discovery under rule 16. Compare ABA Project on Standards for Criminal Justice, Standards Relating to Electronic Surveillance

**7.** Fed.R.Evid. 801(d)(2)(E) states that a statement is not hearsay if "[t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

[T]he *Petrozziello* rule is designed to protect the integrity of the trial in borderline situations where the prosecution may or may not be able to muster sufficient proof of the existence, scope, shape, and duration of an alleged conspiracy. If the defendant elects not to put the government to this test—either for tactical reasons or because the outcome, realistically, is foreordained—he is in a poor position to complain after the fact. As we stated in *United States v. David E. Thompson, Inc.*, 621 F.2d 1147, 1153 (1st Cir.1980), "[i]n the absence of a proper objection, Fed.R.Evid. 103(a)(1), a deviation from the standard announced in *Petrozziello* will be reversed only upon a showing of plain error."

■■■■ The "plain error" standard requires the reviewing court to ask: (1) whether there is an error; (2) whether the error is "plain," a term synonymous with "clear" or "obvious"; and (3) whether the error affected substantial rights. *United States v. Olano*, — U.S. —, —— — ——, 113 S.Ct. 1770, 1777–1778, 123 L.Ed.2d 508 (1993); *see also* Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). An "error rises to this level only when it is so shocking that it seriously affected the fundamental fairness and basic integrity of the proceedings conducted below." *United States v. Ortiz*, 23 F.3d 21, 26 (1st Cir.1994) (internal quotations omitted).

■■■■ Applying the plain-error standard, we reject Díaz–Pérez's argument. Even assuming *arguendo* that Díaz–Pérez was not involved in a conspiracy with the persons on the tapes and, therefore, that the judge could not have made the required findings under *Petrozziello*, we do not believe that the error passes the "clear" or "obvious" hurdle. "Where the error defendant asserts on appeal depends upon a factual finding the de-

fendant neglected to ask the district court to make, the error cannot be 'clear' or 'obvious' unless the *desired* factual finding is the only one rationally supported by the record below." *United States v. Olivier–Diaz*, 13 F.3d 1, 5 (1st Cir.1993) (emphasis added). In this case, Díaz–Pérez's "desired" factual finding is that she was not involved in a conspiracy with the Chita's Colombian contacts.[8] We do not believe, however, that such a finding is the "only one rationally supported by the record below." Rather, the non-hearsay evidence presented at trial makes it plausible that Díaz–Pérez was involved in a conspiracy to distribute cocaine. In fact, Count One of the Indictment charged both defendants with "aiding and abetting each other, and others to this Grand Jury unknown." Additionally, while the tape recordings between Chita and his Colombian contacts do not mention Díaz–Pérez by name, the Colombian contacts did indicate that the informant would be contacted by a female schoolteacher in Puerto Rico. *See United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir.1992) (holding that there was no plain error in district court's failure to make an unrequested *Petrozziello* finding because enough evidence existed to support a finding, based on a preponderance of the evidence, that the codefendants were participating in a conspiracy at the time the statements were made), *cert. denied*, — U.S. —, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993).

■■■■ Accordingly, because Díaz–Pérez failed to produce any evidence at trial to deny her role in a conspiracy, we cannot conclude that the district court committed obvious error in allowing the tapes into evidence. Therefore, because the alleged error is not clear or obvious, we need not reach the other elements of the plain-error review.

## C. Judicial Bias

Díaz–Pérez also complains that throughout the trial, the district court "overstepp[ed] its

---

8. To the extent that Díaz–Pérez also challenges the admission of Chita's statements, we think that his part of the conversations served as " 'reciprocal and integrated utterance(s),' " *United States v. McDowell*, 918 F.2d 1004, 1007 (1st Cir.1990) (quoting *United States v. Metcalf*, 430 F.2d 1197, 1199 (8th Cir.1970)), to put the Colombian contacts' statements "into perspective

and make them 'intelligible to the jury,' " *id.* (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C.Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 1587, 39 L.Ed.2d 885 (1974)). Because Chita's statements were offered only for context and not for the truth of the matter asserted, those statements are not hearsay under Fed.R.Evid. 801(c).

bounds and assum[ed] the role of an advocate for the prosecution" and "constantly interjected in a manner that indicated annoyance and bias against [defense] counsel," thus preventing Díaz–Pérez from having a fair trial.

 "It cannot be gainsaid that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *United States v. Nueva,* 979 F.2d 880, 885 (1st Cir.1992) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)) (alteration in *Nueva* ), *cert. denied,* —— U.S. ——, 113 S.Ct. 1615, 123 L.Ed.2d 175 (1993). Accordingly, a trial judge should be fair and impartial in his or her comments during a jury trial. *United States v. Twomey,* 806 F.2d 1136, 1140 (1st Cir.1986). However, "a finding of partiality should be reached only 'from an abiding impression left from a reading of the entire record.'" *Id.* (quoting *Offutt v. United States,* 348 U.S. 11, 12, 75 S.Ct. 11, 12, 99 L.Ed. 11 (1954)). After scrutinizing the entire record with care, we are left with no such abiding impression.

### D. Cocaine in the Jury Room

 Both defendants argue that the district court abused its discretion when it permitted an unwrapped sample of cocaine to be sent into the jury room during deliberations. The unwrapped cocaine had been offered into evidence by the government, without objection, as part of a representative sample of the cocaine that had been seized at the time of defendants' arrest. Immediately after the jury charge, however, defense counsel did object to the unwrapped cocaine being sent into the jury room on the grounds that the evidence was confusing, unnecessary, and inflammatory. We are not persuaded.

 We review a district court's decision to send evidence into the jury room for abuse of discretion. *United States v. McCarthy,* 961 F.2d 972, 978 (1st Cir.1992) ("Whether evidentiary exhibits properly admitted should or should not accompany the jury to the jury room is a discretionary matter for the trial court.") (internal quotations omitted); *United States v. Rawwad,* 807 F.2d 294, 297 (1st Cir.1986) (reviewing the district court's decision to send more than fifteen pounds of heroin into the jury room for

abuse of discretion), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). District courts have discretion to allow properly admitted evidence to accompany the jury into the jury room. *Rawwad,* 807 F.2d at 297. This is true even when the evidence is drugs, for the presence of drugs in the jury room is not *per se* prejudicial or inflammatory. *Id.*

Defendants argue that even if it would generally be within a district court's discretion to allow drugs to be sent into the jury room, the district court nonetheless abused its discretion in this case because defendants' knowledge of what was in the wrapped packages was at issue. In particular, defendants contend that the jurors "would [have been] instantly struck by the clear plastic bags of a white powdery substance" during their deliberations and would have been confused. We do not agree. In reviewing the record, we find no reason why the presence of the unwrapped cocaine sample in the jury room would have been particularly inflammatory or prejudicial to defendants. During trial, there was substantial, uncontroverted testimony that the cocaine was wrapped in such a way that it would not have been possible for anyone to see through the packaging. Additionally, during the charge, the court instructed the jurors that the government had stipulated that no one could "see from the outside what was in the wrapped bags," and that defendants' pleas of not guilty put all the essential elements of the charged offense at issue, including knowledge and intent. Finally, in addition to the unwrapped cocaine, other items of evidence were also sent into the jury room, including samples of the packaging material and kilograms of cocaine in their original wrapping.

### E. Sufficiency of the Evidence as to de la Cruz–Paulino

 At the close of the government's case in chief, de la Cruz–Paulino moved, pursuant to Fed.R.Crim.P. 29, for a judgment of acquittal, contending that the government had not presented sufficient evidence to sustain a conviction. After the district court denied the motion, de la Cruz–Paulino presented no evidence in her own defense. Ac-

cordingly, unlike defendants who do present evidence, de la Cruz–Paulino did not waive review of the district court's initial Rule 29 decision. *United States v. Clotida,* 892 F.2d 1098, 1100 (1st Cir.1989); 2 Charles A. Wright, *Federal Practice and Procedure: Criminal* § 463, at 642 (2d ed.1982). This is so even though de la Cruz–Paulino's codefendant did mount a defense by testifying in her own behalf. *See Clotida,* 892 F.2d at 1103. Thus, on appeal we must determine whether, "when examined in a light most favorable to the government, the evidence presented in the government's case-in-chief, including all inferences that may be drawn therefrom, would permit a reasonable juror to find guilt beyond a reasonable doubt." *Id.* Even though Díaz–Pérez's testimony might have influenced the jury in its decision to convict de la Cruz–Paulino, we may not consider that testimony on appeal. *See id.; cf. McGautha v. California,* 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971) ("a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in doing so he will bolster the Government case enough for it to support a verdict of guilty"); 2 Wright, *Federal Practice and Procedure: Criminal* § 463, at 645 (if the defendant presents evidence after the denial of his or her Rule 29 motion, "[t]he conviction will be affirmed, even though the prosecution may have failed to make a prima facie case, if the evidence for the defense supplied the defect, and the whole record is sufficient to sustain a conviction").

Taken in the light most favorable to the government, the evidence presented during the government's case in chief established the following: (1) de la Cruz–Paulino helped move garbage bags containing sealed packages of cocaine into Díaz–Pérez's car; (2) de la Cruz–Paulino was in the car while Díaz–Pérez spoke with Agent Andaluz on her cellular telephone; (3) de la Cruz–Paulino was present at the Burger King delivery scene; and (4) after Agents Andaluz and Salazar opened one of the garbage bags, de la Cruz–Paulino stated, "No, watch out the police is around, going around here." De la Cruz–Paulino argues that because this evidence is insufficient to allow a jury to conclude beyond a reasonable doubt that she aided and abetted Díaz–Pérez and others in the possession of cocaine with intent to distribute, the district court should have granted her Rule 29 motion for judgment of acquittal at the close of the government's case in chief. We agree.

■■■■ To be convicted of aiding and abetting, more than "mere presence" at the scene is required. *United States v. Mehtala,* 578 F.2d 6, 9 (1st Cir.1978). The classic definition of aiding and abetting, adopted by the Supreme Court, was first enunciated by Learned Hand:

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed."

*Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.)). Thus, for de la Cruz–Paulino to have been convicted under an aiding-and-abetting theory, the government had to prove (1) that Díaz–Pérez committed the underlying substantive crime and (2) that de la Cruz–Paulino shared Díaz–Pérez's criminal intent. *See United States v. Valerio,* 48 F.3d 58, 64 (1st Cir.1995). The government fulfilled the first prong, for Díaz–Pérez was convicted. To fulfill the second prong, the government had to prove that de la Cruz–Paulino "consciously shared [Díaz–Pérez's] knowledge of the underlying criminal act, and intended to help [her]," *United States v. Taylor,* 54 F.3d 967, 975 (1st Cir.1995); *see also United States v. Loder,* 23 F.3d 586, 591 (1st Cir.1994) (discussing specific-intent requirement for aiding and abetting). This the government did not do.

■■■■ "[T]he line that separates mere presence from culpable presence is a thin one, often difficult to plot." *Ortiz,* 966 F.2d at 712. On the one hand, "[m]ere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be com-

mitted sufficient to establish aiding and abetting." *Mehtala*, 578 F.2d at 10 (internal quotation omitted); *see also United States v. Campa*, 679 F.2d 1006, 1010 (1st Cir.1982) ("Mere presence at the scene and knowledge that a crime is being committed is generally insufficient to establish aiding and abetting. The government must prove some affirmative participation by the aider and abettor.") (internal citation omitted). On the other hand, "there are circumstances where presence itself implies participation—as where a 250-pound bruiser stands silently by during an extortion attempt, or a companion stands by during a robbery, ready to sound a warning or give other aid if required." *Ortiz*, 966 F.2d at 712 (internal quotation omitted).

In the instant case, the government presented no direct evidence [9] during its case in chief that de la Cruz–Paulino (1) had any knowledge that the garbage bags contained cocaine, (2) had any connection to the drugs prior to Andaluz suggesting to Díaz–Pérez, during their 7:55 p.m. conversation, that she pay someone $40 to help her carry the packages to her car,[10] or (3) was to be paid more than $40 for her involvement in the drug venture. The government argues that the jury was nevertheless entitled to find beyond a reasonable doubt that de la Cruz–Paulino aided and abetted Díaz–Pérez in the possession of cocaine with intent to distribute because (1) criminals do not usually welcome nonparticipants as witnesses to their criminal activities and (2) the facts, especially her involvement in moving the packages from an apartment to Díaz–Pérez's car and her statement about the police being around, imply that de la Cruz–Paulino knowingly participated in the venture and intended to help it succeed. We do not agree.[11]

The evidence suggests that de la Cruz–Paulino was brought in to do a menial task, namely carrying the cocaine from the apart-

---

9. Of course, a conviction may be premised entirely on circumstantial evidence. *United States v. Torres–Maldonado*, 14 F.3d 95, 100 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994). As we explained in *Clotida*, 892 F.2d at 1104 (alterations in *Clotida*),

> Circumstantial evidence has been defined as "proof which does not actually assert or represent the proposition in question, but which asserts or describes something else, from which the trier of fact may either (i) reasonably infer the truth of the proposition, ... or (ii) at least reasonably infer an increase in the probability that the proposition is in fact true...."

1 D. Louisell & C. Mueller, *Federal Evidence* § 94 (1977). It has been noted that "[t]he ... general problem of circumstantial proof is to determine whether proffered evidence indirectly or inferentially supports the proposition sought to be proved." *Id.* at § 91.

It cannot be doubted, however, that circumstantial evidence is often very probative. As Professor Wigmore notes, without allowing the introduction of evidence that permits "an inference upon an inference," "hardly a single trial could be adequately prosecuted." 1A J. Wigmore, *Evidence* § 41 (1983). Indeed, "the courts in general have recognized that circumstantial evidence may, in given settings, have equal if not greater weight than direct evidence." 1 C. Torcia, *Wharton's Criminal Evidence* § 5 (14th ed. 1985). Furthermore, it is important to note that, in the context of review of a motion for acquittal, "no legal distinction exists between circumstantial and direct evidence." *United States v. Sutton*, 801 F.2d 1346, 1358 (D.C.Cir.1986).

10. During their 7:10 p.m. conversation, Díaz–Pérez, upon being asked where she was, responded, "I'm here in ... what's the name of this place, girl? In Trujillo Alto." The government did not establish the identity of the person Díaz–Pérez conferred with during its case in chief, and we do not think the jury was entitled to infer that de la Cruz–Paulino was involved in the drug venture prior to Andaluz's later suggestion that Díaz–Pérez pay someone $40 to help her move the packages from the fact that Díaz–Pérez questioned an unidentified female, whose voice does not register on tape, about their whereabouts.

During cross-examination, Díaz–Pérez agreed that de la Cruz–Paulino was the off-tape person who told her that they were in Trujillo Alto, where de la Cruz–Paulino lived. Because Díaz–Pérez's testimony was outside the government's case in chief, however, we will not consider it. *See Clotida*, 892 F.2d at 1105 n. 1.

11. We find the government's three-page discussion of de la Cruz–Paulino's sufficiency-of-the-evidence challenge disappointingly conclusory. Unlike the government, we do not think that "[t]he evidence of guilt, as to both appellants, was simply overwhelming." On the contrary, the evidence against de la Cruz–Paulino was quite sparse, and a more thorough discussion from the government would have aided us greatly in our assessment of its sufficiency. We reiterate that "[d]espite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." *Ortiz*, 966 F.2d at 711–12. The government should not treat it as one.

ment where it was stored down to Díaz–Pérez's car. The government presented no evidence that de la Cruz–Paulino was involved prior to Andaluz suggesting to Díaz–Pérez that she pay someone $40 to help her carry the packages to her car.[12] No reasonable jury could have concluded, beyond a reasonable doubt, that Díaz–Pérez would have hired only someone already participating in the drug venture to do this menial task and therefore that de la Cruz–Paulino was already involved. Accordingly, we must determine whether a reasonable jury could conclude beyond a reasonable doubt that de la Cruz–Paulino developed the specific intent to aid and abet Díaz–Pérez in the approximately two hours between Andaluz's $40 suggestion and the ensuing arrests.

We do not think that the evidence supports the inference that de la Cruz–Paulino was told about and joined the drug venture after Andaluz's $40 suggestion. The drugs were elaborately wrapped in sealed packages [13] that were then placed into three garbage bags. Unless she was a participant in the drug venture prior to Andaluz's suggestion, an inference we have held to be impermissible, de la Cruz–Paulino could not have seen the drugs in their unpackaged form. The drugs were assuredly packaged before Andaluz made the $40 suggestion, for the time period between that suggestion (made at 7:55 p.m.) and the actual arrest (at 9:55 p.m.) would have been too short to package and transport the drugs, especially given that Díaz–Pérez spoke with Andaluz from her car during that time. There is also no indication from the taped conversations between Díaz–Pérez and Andaluz that she had anything to do with the drugs other than move them down from the apartment to her car.[14] While de la Cruz–Paulino admitted to helping carry "it" from the apartment to the car,

responding to Salazar's question, "Did you get it down?" with "Of course we did," there is no evidence that de la Cruz–Paulino saw the packages inside the garbage bags until the time of her arrest.

We see no basis for concluding that Díaz–Pérez cut de la Cruz–Paulino in on the drug transaction after soliciting her package-carrying services. Díaz–Pérez had a menial job that de la Cruz–Paulino was willing to do for $40; there was no need for Díaz–Pérez to cut de la Cruz–Paulino into the deal to obtain her package-carrying services. *Cf. United States v. Francomano*, 554 F.2d 483, 487 (1st Cir. 1977) (holding that there was "no basis for a reasonable inference" that the defendants were cut in on the drug deal when the record indicated that they were willing to perform the required crewmember services with "no special inducement"). The jury could not, without engaging in impermissible inference, conclude that de la Cruz–Paulino was entitled to anything other than $40 for her package-carrying services. Indeed, there is no evidence about Díaz–Pérez's own compensation arrangement. As Díaz–Pérez was not supposed to obtain any money from the government agents when she turned over the packages to them, there is no basis for inferring that de la Cruz–Paulino thought she would receive a portion of the funds collected.

■■■ Of course, an aider and abettor need not receive compensation or have any stake in a transaction to be convicted. *See United States v. Winston*, 687 F.2d 832, 834–35 (6th Cir.1982). Thus, in *United States v. Cuevas–Esquivel*, 905 F.2d 510, 515 (1st Cir.), *cert. denied*, 498 U.S. 877, 111 S.Ct. 208, 112 L.Ed.2d 169 (1990), we upheld the conviction of a defendant who testified that he was only paid $33 for being a deckhand on board a boat carrying a large amount of marijuana. Similarly, in *United States v. Steuben*, 850

---

**12.** See *supra* note 10.

**13.** The government stipulated that it was impossible to see the cocaine inside the packages.

**14.** In fact, the recorded conversation that began at 7:27 p.m. contains the following discussion between Díaz–Pérez (D) and Andaluz (A):
 A: Listen, how is that packed?
 D: Ah?
 A: Do you have it packed already?

D: It's, I told you all complete in a bag.
A: What do you mean a bag?
D: Like that. Thirty, thirty-two, like that.
A: It's still in bags, is not in boxes or suit cases?
D: No.
A: In bags, hell.
D: No, but it's in one black trash bag.
A: Hello?
D: Yes, it's in one black trash bag.

F.2d 859, 866 (1st Cir.1988), we affirmed the conviction of a defendant who claimed that he was paid $300 for being a crewmember on board a tugboat carrying $42 million worth of marijuana. In both cases, however, we held that there was sufficient other evidence for the jury to conclude that the defendants were not just crewmembers, but rather full-fledged participants in the criminal ventures. Unlike those cases, the $40 payment in the instant case is corroborated by the fact that Andaluz suggested it, and there is little other evidence indicating that de la Cruz–Paulino was actually involved in the drug venture. Thus, while compensation of only $40 would not by itself counter other evidence establishing that de la Cruz–Paulino was a participant in the criminal venture, that compensation, especially suggested as it was by a government agent, tends to negate an inference that de la Cruz–Paulino was more heavily involved.

We next consider whether the fact that de la Cruz–Paulino overheard some of Díaz–Pérez's telephone conversations [15] and came to the Burger King delivery site is evidence that she was a full-fledged participant in the drug venture. It is true that "it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes." *United States v. Batista–Polanco*, 927 F.2d 14, 18 (1st Cir.1991). Thus, we have upheld convictions of defendants where the facts suggested that they witnessed open and obvious criminal activity and therefore allowed the inference that the defendants participated in that criminal activity. For example, in *Batista–Polanco*, we upheld the conviction of a defendant arrested at an apartment while a large-scale heroin-packaging operation was in process throughout the apartment, stating "we cannot accept the hypothesis that participants in a distribution scheme would permit a noncontributing interloper to remain for an extended period of time in a small apartment while their conspicuous criminal conduct con-

tinued unabated." *Id.* In that case, however, the presence of six seats—one a makeshift seat consisting of an overturned bucket with a cushion and one with the defendant's sweater on it—around the kitchen table at which the heroin was packaged also suggested that the defendant was a participant along with the five other men arrested at the apartment. *Id.*

On the other hand, a defendant who was present at the scene of a crime and who had knowledge that a crime was being committed cannot be convicted of aiding and abetting unless the jury can reasonably infer that the defendant shared the specific intent of the principal. The fact that criminal activity occurs in front of someone does not always allow the inference that that someone was a participant. Thus, in *United States v. Paone*, 758 F.2d 774, 776 (1st Cir.1985), we suggested that if the defendant had merely been a passenger in the back seat of a car while drugs were handed over to a purchaser, rather than someone who was repeatedly present at important junctures of a drug deal, the evidence might have been insufficient to support his conviction.

We assume that de la Cruz–Paulino overheard Díaz–Pérez's side [16] of the three telephone conversations that took place after Andaluz suggested that she pay someone to help her carry the packages. We have scrutinized those conversations with care and find that they do not provide a basis for inferring that de la Cruz–Paulino shared Díaz–Pérez's specific intent to possess cocaine for distribution. While they would support Díaz–Pérez's conviction, especially since Andaluz used the word "kilos," we do not think that an innocent observer to Díaz–Pérez's side of the conversations would infer that a drug transaction was being discussed. Nor do we think the fact that Díaz–Pérez felt free to conduct her side of the conversation in front of de la Cruz–Paulino indicates that de la Cruz–Pauli-

---

**15.** After the government agent made his $40 suggestion at 7:55 p.m., Díaz–Pérez engaged in three more telephone conversations with him, at 8:35 p.m., 9:29 p.m., and 9:45 p.m. We assume that de la Cruz–Paulino was present for all three calls. De la Cruz–Paulino's voice is heard in the background of the call made at 9:29 p.m.

**16.** There is no evidence that the conversations were conducted on a speaker phone so that de la Cruz–Paulino could have heard Andaluz's side as well.

no was a participant in the drug venture, for Díaz–Pérez could control her responses. Indeed, she did not speak explicitly about cocaine at any time. We note that Díaz–Pérez did mention obtaining the $40 from the government agents during one of those conversations.[17]

That de la Cruz–Paulino came to the Burger King delivery scene also does not indicate that she was a knowing participant in the drug venture. While criminals generally might be presumed not to bring along nonparticipants to witness their criminal activities, we do not think that necessarily holds true when the criminal activity will not be open and obvious. *Compare Clotida*, 892 F.2d at 1105 (reversing as insufficient the defendant's conviction for aiding and abetting her travelling companion in drug crimes involving cocaine-laden clothing mixed in suitcases with her own clothing). In this case, no negotiations were to be entered into and no money was to be exchanged: the government agents were simply supposed to take the car for a few minutes, unload it, and bring it back. Díaz–Pérez responded to Andaluz's question, "Which is your car?" by stating, "That black one over there, in the trunk, two bales and ... eight doubles...." Then Andaluz and Salazar opened the trunk and one of the garbage bags, Andaluz saying that he had "[t]o check it out girl, because what will I do with [unintelligible]." Díaz–Pérez became very upset and exclaimed, "Shut up! Oh God, the two bales and the other stuff." At this point, Andaluz stated, "No, relax, we are getting involved here to get a party," and then de la Cruz–Paulino stated, "No, watch out the police is around, going around here."

We do not think that de la Cruz–Paulino's comment, "No, watch out the police is around, going around here," is sufficient in this context to allow a reasonable jury to conclude that de la Cruz–Paulino specifically intended to aid and abet Díaz–Pérez in possessing cocaine for distribution. Even if de la Cruz–Paulino could have inferred from Díaz–Pérez's sudden shift in attitude and her statements about the "two bales," and from the two government agents' opening of one of the garbage bags, that, unbeknownst to her, a drug transaction was going on, such last-minute knowledge would not support the conclusion that she shared the specific intent to possess cocaine for distribution. *See Francomano*, 554 F.2d at 487 ("Even if it could be inferred that appellants acquired knowledge of the throwing of the packages [of marijuana] overboard, such last minute knowledge together with all other evidence produced by the Government affords no legal basis for appellants' conviction as aiders and abetters."); *see also United States v. Lopez–Pena*, 912 F.2d 1536, 1538 (1st Cir.1989) (stating that warning about police in the area and advice on avoiding arrest were what "anyone might do as a friend").

The evidence in this case is close to the line of being enough to sustain a conviction. Nevertheless, in reversing de la Cruz–Paulino's conviction, we keep in mind the following:

> [E]vidence might raise a question in a reasonable man's mind. But that is not enough. Guilt, according to a basic principle in our jurisprudence, must be established beyond a reasonable doubt. And, unless that result is possible on the evidence, the judge must not let the jury act; he must not let it act on what would necessarily be only surmise and conjecture, without evidence.

*United States v. Campbell*, 702 F.2d 262, 267 (D.C.Cir.1983) (quoting *Cooper v. United States*, 218 F.2d 39, 42 (D.C.Cir.1954)) (alteration in *Campbell*).

### III.

### CONCLUSION

For the forgoing reasons, the conviction of Díaz–Pérez is *affirmed* and the conviction of de la Cruz–Paulino is *reversed.*

---

17. Andaluz also testified that, although de la Cruz–Paulino's comment during the 9:29 conversation he had with Díaz–Pérez was not intelligible on the recording, she said "something like they're going to have to give us the forty dollars or words to that effect."